# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 4, 2010 Session

## STATE OF TENNESSEE v. JOHN PATRICK HENRETTA

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Bradley County**
**No. 97-334      R. Steven Bebb, Judge**

---

**No. E2007-01750-SC-DDT-DD - Filed September 30, 2010**

---

This capital case involves the 1988 rape, murder, robbery, and kidnapping of a thrift store employee in Cleveland, Tennessee. A Bradley County jury convicted the defendant of premeditated murder, felony murder, two counts of robbery with a deadly weapon, two counts of aggravated rape, and two counts of aggravated kidnapping. The trial court merged the premeditated murder and felony murder convictions into a single conviction for which the jury imposed a sentence of death after hearing proof of aggravating and mitigating circumstances. The trial court merged the remaining convictions into a single conviction for each offense and imposed concurrent sentences of forty-five years for robbery with a deadly weapon, fifty years for aggravated kidnapping, and fifty years for aggravated rape, all concurrent with the sentence of death. The Court of Criminal Appeals affirmed the defendant's convictions and sentences. On automatic appeal pursuant to Tennessee Code Annotated section 39-13-206(a)(1), we have considered all issues raised by the defendant, including the following issues, which we designated for oral argument: (1) whether the trial court erred in having insufficient regard for the heightened standard of due process in capital cases by failing to grant a mistrial, by allowing prosecutorial argument on future dangerousness while not instructing the jury on the effect of their failure to agree or ensuring that the jury knew the defendant would never leave prison alive, and by not sua sponte instructing the jury on the defense of voluntary intoxication; (2) whether the defendant is entitled to relief for pre-indictment delay in filing the notice of intent to seek the death penalty and/or for the trial court's refusal to dismiss the indictment with prejudice because the State violated the anti-shuttling provisions of the Interstate Agreement on Detainers; (3) whether the search of the defendant at the federal penitentiary in Leavenworth, Kansas was defective such that its fruits should have been suppressed; and (4) whether the sentence of death is disproportionate under the review mandated by Tennessee Code Annotated section 39-13-206(c)(1) (2006). We conclude that none of the issues presented entitle the defendant to relief and, therefore, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals Affirmed**

SHARON G. LEE, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Charles G. Currier, Knoxville, Tennessee (on appeal and at trial); Steven B. Ward, Madisonville, Tennessee (on appeal); and Charles Corn, Cleveland, Tennessee, District Public Defender (at trial), for the appellant, John Patrick Henretta.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson and James E. Gaylord, Senior Counsel; Jerry Estes, District Attorney General; and Sandra Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

On November 30, 1988, Frances Rose Crabtree,[1] a thirty-two year old mother of two minor children, was working alone as a sales clerk at the Salvation Army Thrift Store in Cleveland, Tennessee. Between 4:30 and 5:00 p.m., Ms. Crabtree spoke with her sister by telephone from the store, and they made plans to meet at church at 7:00 that night. When Ms. Crabtree failed to meet her sister at church, her sister and some friends went to the store to search for her. Ms. Crabtree's car was still parked at the store, the front door of the store was locked, and her lunch box and coat were lying on the checkout counter in the front part of the store, but Ms. Crabtree was not located. The police were called, and in the middle section of the store, they discovered an empty cash register drawer, scattered receipts, an empty money bag, and one of Ms. Crabtree's shoes. In a cluttered storage room at the rear of the store, officers found Ms. Crabtree's body near a large pool of blood. She was partially covered by a bed cover and was clothed in a blouse, bra, and skirt. She had been stabbed three times in the neck – twice on the left side and once on the right. One of the wounds to the left side of her neck had not cut any large veins or arteries; however, the other wound to that side of the neck had severed the jugular vein. The wound to the right side of Ms. Crabtree's neck was fatal and had severed the carotid artery, the jugular vein, and cut through the ligaments holding the backbone together, exposing the spinal cord. Medical

---

[1] There is a conflict in the record as to the spelling of Ms. Crabtree's first name. For example, the medical examiner's report refers to the victim as "Frances Rose Crabtree," while TBI reports refer to her as "Francis Rose Crabtree." We have chosen to employ the traditional female spelling "Frances" in this opinion.

examination confirmed that Ms. Crabtree died from loss of blood as the result of these wounds. Ms. Crabtree's panties and purse containing $420 in cash were missing along with store proceeds in the amount of $189.60. No murder weapon was found. Subsequent Tennessee Bureau of Investigation ("TBI") laboratory examination of vaginal swabs taken from Ms. Crabtree, her skirt, and the bed cover that had been draped over her body revealed the presence of sperm, suggesting that Ms. Crabtree may have been raped. This evidence, along with samples of her blood, saliva, and hair, was sent to the Federal Bureau of Investigation ("FBI") for deoxyribonucleic acid ("DNA") analysis.

Ms. Crabtree's murder remained unsolved for the next several years. Then, in early 1994, Lieutenant Danny Chastain of the Cleveland Police Department saw a National Crime Information Center teletype from police in Philadelphia, Pennsylvania, directed to any Tennessee police agency having an unsolved November 1988 homicide involving a female store employee whose throat had been cut. Lieutenant Chastain learned that this teletype was prompted by a letter that had been received by a federal judge in Philadelphia from an individual identified as Michael Goodhart, who was then incarcerated in Bastrop County Federal Correctional Facility in Texas. Lieutenant Chastain telephoned Mr. Goodhart, who advised him that the murder he had witnessed had occurred between 5:00 and 6:00 p.m. in a thrift store after the store had closed and that the murderer was presently incarcerated. Further investigation revealed that Mr. Goodhart and the defendant, John Patrick Henretta, had been traveling together at the time of the thrift store murder and that after the murder, on December 3, 1988, they had been arrested together outside of Little Rock, Arkansas. Mr. Goodhart and Mr. Henretta were wanted by the FBI for a kidnapping at knifepoint that had occurred on or about the day after Thanksgiving of 1988, and Mr. Henretta had previously been convicted of homicide and rape and was currently a suspect in yet another homicide.

In February of 1994, Lieutenant Chastain and TBI Agent Brooks Wilkins traveled to Texas to speak further with Mr. Goodhart and then went to Leavenworth, Kansas, where Mr. Henretta was incarcerated at the Leavenworth Federal Correctional Facility ("Leavenworth"). Upon presentation of their affidavit to a Leavenworth County judge, Lieutenant Chastain and Agent Wilkins were issued a search warrant to obtain samples of Mr. Henretta's blood, saliva, and hair.

Lieutenant Chastain and Agent Wilkins met with Mr. Henretta at Leavenworth on February 11, 1994, accompanied by an FBI agent assigned to the penitentiary, a forensic scientist with the Kansas Bureau of Investigation, and a corrections officer employed by the penitentiary. Agent Wilkins had a copy of the search warrant with him and advised Mr. Henretta that they were there to investigate a murder that had occurred in Tennessee in 1988 and explained that the purpose of the search warrant was to collect blood, hair, and saliva

samples from him. Mr. Henretta was cooperative, and after the samples were taken, Agent Wilkins advised Mr. Henretta that the investigation concerned the murder of Frances Rose Crabtree in Cleveland, Tennessee, in November of 1988. Mr. Henretta expressed his willingness to talk and after signing a waiver of his Miranda rights, was interviewed by Agent Wilkins, providing the following signed sworn statement:

We (Michael Goodhart and myself) left Pennsylvania and we were on the run. I was on Parole out of Penn. We went to Florida, Georgia, and Alabama. We were coming back from Florida at this time. We stopped in Tennessee and I did not know the Town. We got there around noon or lunch time. We were still driving the stolen Toyota from Penn. We were drinking and stuff at some bar down the corner from the Salvation Army Store. We hung around about two hours or so and went back by the store and hung around till she closed at 4:30 or 5:00 PM. Goodhart opened up the back door after hiding in the store. I came in the back door. We went in and we both grabbed her back at the store room entrance. We told her to lay down and Goodhart st [sic] sex with her first and I went and got her purse. There was money in the purse. There was $300.00 to $340.00 dollars in the purse. There was another $100.00 in a money bag in one dollar bills. After I got her purse I went back and had sex with her. She was not putting up a struggle or screaming. We both had knifes [sic], there [sic] were about twelve inches long. The black handle knife found in the car when we were arrested was the knife that was used in this murder. I believe This [sic] was my knife. She got up right as I got done having sex with her and Goodhart wanted to take her with us. She said that we could not go out the back door because there was a police station right out the back door. So I asked Goodhart what he wanted to do – I said do you want me to kill her. He said yes. So I took my knife with my right hand and struck her one time in the neck. Goodhart asked me if she was dead and he poked her with his knife to make sure. We took her purse and panties and hose and everything and put it in a bag. I think we burned it in Alabama. I believe we threw her purse in a trash can by the Waterfront in Memphis. About five minutes before we left, I moved her and turned her over and covered her up with I guess a white blanket. We left out the back of the store and got in the car and left. We left town and

-4-

went to Arkansas. We traveled on the Interstate. The clothes were burned the next day. I covered her up because I knew what I did was wrong.

We stayed in a motel in Brickley [sic], Arkansas where we were busted by the FBI.

The original deal in this was to just rob her. That was what we intended to do. We did not go in with the idea to kill her.

The lights were not on when we got in and they were never turned on. Goodhart was the one that moved the cash register drawer. I did not.

The lady was wearing a blue jean skirt, pink top, she was a nice looking lady.

In addition to this statement, Mr. Henretta drew and signed an accurate map of the layout of the store that showed where Ms. Crabtree was killed and other details of the crime scene. After giving his statement, Mr. Henretta told the officers that he would be willing to come to Tennessee and plead guilty in return for a life sentence if the death penalty was not sought.

The blood, saliva, and hair samples obtained from Mr. Henretta were received by the TBI laboratory for testing and were sent to the FBI on March 8, 1994, for DNA analysis. The analysis was completed in April of 1997 and revealed that Mr. Henretta's DNA matched DNA found on Ms. Crabtree's skirt and on the vaginal swabs taken from Ms. Crabtree.[2] On August 20, 1997, Mr. Henretta was indicted for premeditated murder, felony murder in the perpetration of robbery, two counts of aggravated robbery, two counts of aggravated rape, and two counts of aggravated kidnapping. On the same date, the State filed notice that it would seek the death penalty.

---

[2] Alan Giust, a forensic examiner in the FBI laboratory's DNA Analysis Unit, testified that the probability of a random person having the same DNA profile shown in the samples obtained from Mr. Henretta would "be approximately 1 in 230,000,000 from the African-American population, approximately 1 in 88,000 from the Caucasian population and approximately 1 in 140,000 from the Southeastern Hispanic population, and approximately 1 in 52,000 for the Southwestern Hispanic population." Mr. Giust further testified that the improbability that another male would have the same profile would increase by a factor of two and thus, the probability that a random Caucasian male would have the same DNA profile as Mr. Henretta would be 1 in 176,000.

On October 3, 1997, Mr. Henretta was transferred from Leavenworth to the Bradley County jail for arraignment and was thereafter returned to Leavenworth on November 3, 1997. The case was tried in April of 2002. During the guilt/innocence phase of the trial, Mr. Henretta presented no witness testimony but entered documentary evidence showing that he had been sentenced to imprisonment for life without possibility of parole in Pennsylvania. In his statement to the jury, defense counsel conceded that Mr. Henretta committed the charged crimes of robbery, rape, and murder, stating "You have heard proof that John Patrick Henretta robbed, raped, and murdered Rose Crabtree. You have not heard from me, nor will you ever, or from Mr. Henretta, anything to the contrary. Those are true." Defense counsel further advised the jury "this case . . . is only about sentencing." The jury convicted the defendant of premeditated murder in the first degree, felony murder in the first degree, two counts of robbery with a deadly weapon, two counts of aggravated rape, and two counts of aggravated kidnapping. The trial court merged the premeditated murder conviction and the felony murder conviction into a single conviction and the convictions of robbery with a deadly weapon, aggravated rape, and aggravated kidnapping into a single conviction for each offense.

During the subsequent sentencing phase of the trial, the State asserted the existence of four statutory aggravating factors. First, the State presented proof that "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person," Tenn. Code Ann. § 39-2-203(i)(2) (1982). In that regard, the State established that on October 11, 1974, Mr. Henretta was convicted of a rape occurring in Crawford County, Pennsylvania on July 17, 1974; on June 17, 1991, he was convicted of a second degree murder occurring in Lawrence County, Pennsylvania on September 19, 1988, and of a rape occurring in that county on November 14, 1988; and on July 7, 1989, he was convicted of a kidnapping occurring on November 23, 1988. With respect to the aggravating factor that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," Tenn. Code Ann. § 39-2-203(i)(5), the State relied on proof adduced during the guilt phase pertaining to the nature of the wounds inflicted upon Ms. Crabtree and other circumstances of her murder. As to the aggravating circumstance that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," Tenn. Code Ann. § 39-2-203(i)(6), the State relied upon proof introduced during the guilt phase as to the close proximity of the police station, showing that Ms. Crabtree was murdered to prevent her from summoning the police. Finally, the State referenced the jury's convictions of rape and felony murder in perpetration of robbery, establishing the aggravating circumstance that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any . . . rape, robbery, . . . [or] kidnapping. . . .," Tenn. Code Ann. § 39-2-203(i)(7).

In addition to proof establishing aggravating circumstances, the State presented victim impact statements written by Ms. Crabtree's children. Ms. Crabtree's daughter, Amanda Crabtree Forest, who was thirteen years old at the time of her mother's murder, wrote that her "life was snatched away from her at a young age" as the result of her mother's murder, "at a time when I needed her the most," and that "[m]y mom was all that my brother and I had and she was who we depended on." Amanda also stated that she is "afraid to fully love someone for fear that they may be taken away from me too," that "[t]here's not a single day that goes by that I don't think about my mom and wonder why all this had to happen," and that "my heart will always be broken." Amanda also stated that as a result of the murder her own daughter has now been deprived of a grandmother. Ms. Crabtree's son, James, who was eleven at the time of her murder, wrote that the murder has injured him forever and has caused him to be depressed and distrustful and that he doesn't like to meet new people and is not able to work alone.

Mr. Henretta presented the testimony of three mitigation witnesses. The first witness was Judy Randolph, who was employed by defense counsel to investigate Mr. Henretta's background. Ms. Randolph testified that Mr. Henretta was born in 1943. When Mr. Henretta was two to three years old, his mother deserted the family, which consisted of himself, his father, and his two brothers, Robert and Terrance. In 1945, Mr. Henretta was given a psychological examination, from which it was determined that he was of "dull normal" intelligence. In 1948, he and his brothers were placed in a Catholic orphanage by his aunt. In 1953, his father took him and his brother Terrance out of the orphanage, and the three lived together along with the father's new wife, who died unexpectedly in 1961.

Mr. Henretta also presented the mitigation testimony of Dr. James Walker, a neuropsychologist. Dr. Walker testified that tests performed on Mr. Henretta showed evidence of brain dysfunction that, among other things, made it difficult for him to inhibit impulses and learn from his mistakes. Dr. Walker determined that Mr. Henretta's intelligence quotient (IQ) is "about 78, 79" and categorized him as "borderline impaired," which he described as "somewhere in that land between normal and mentally retarded." With respect to Mr. Henretta's family history and childhood, Dr. Walker testified that Mr. Henretta told him that when his father was intoxicated he would regularly beat him, that once, his father had threatened him with a knife, and that, often, Mr. Henretta would hide or leave the house when his father had been drinking. Dr. Walker also testified that Mr. Henretta told him that he had been drinking on the day he killed Ms. Crabtree and stated that this consumption of alcohol would have further reduced Mr. Henretta's ability to control his impulses.

Finally, Mr. Henretta presented the testimony of Dr. William Bernet, a forensic psychiatrist who evaluated Mr. Henretta and reiterated much of the testimony of Dr.

Walker. Dr. Bernet conducted personal interviews with Mr. Henretta; arranged for a variety of medical tests that included a magnetic resonance imaging scan (MRI), a computerized axial tomography scan (CAT), and an electroencephalogram scan (EEG). Dr. Bernet also examined previous psychological test results and records from Mr. Henretta's time in prison. Based upon the records he examined and his conversations with Mr. Henretta, Dr. Bernet testified that when Mr. Henretta was a child, his father "would hit Mr. Henretta with a belt, with his fists[,] with sticks, with a fishing pole, . . . to the point of bruising and bleeding" and that once, Mr. Henretta's father made Mr. Henretta get up at 2:00 a.m. and scrub the floor on his hands and knees. Dr. Bernet attested to the circumstances of the sudden death of Mr. Henretta's stepmother, stating that Mr. Henretta and his brother had gone to the store and when they returned, they found her dead, apparently of a stroke. Dr. Bernet speculated that this event constituted one more instance of abandonment that Mr. Henretta experienced during his childhood. Dr. Bernet also testified that Mr. Henretta's brain has been dysfunctional since childhood, that this impairs Mr. Henretta's ability to control sexual and aggressive urges, and that Mr. Henretta suffers from intermittent explosive disorder. Dr. Bernet stated that persons suffering from this disorder "have episodes of failure to inhibit or failure to control or failure to resist aggressive urges, aggressive impulses, to the point where they get totally violent and out of control, and it results in destructive or aggressive or violent acts." Dr. Bernet stated that these outbursts occur after minimal provocation. Based upon information he received from Mr. Henretta that Mr. Henretta and Goodhart "split a fifth of whiskey . . . and drank perhaps eight to ten beers," Dr. Bernet concluded that Mr. Henretta was intoxicated on the day he committed the offenses and that this intoxication would have further reduced Mr. Henretta's ability to control himself.

After presentation of proof and closing arguments, the jury imposed a sentence of death, finding that statutory aggravating circumstances outweighed any mitigating circumstances.[3] As to both the conviction of first degree premeditated murder and the

---

[3] With respect to the balancing of aggravating and mitigating circumstances, the trial court instructed the jury in accord with Tennessee Code Annotated section 39-13-204(g)(1) (1997), which provided as follows:

> If the jury unanimously determines that:
> (A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and
> (B) *Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt*; then the sentence shall be death.

(Emphasis added.) This instruction was erroneous because it was based upon the law in effect at the time
(continued...)

conviction of first degree felony murder, the jury found the following aggravating circumstances: (1) "[t]he defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person," Tenn. Code Ann. § 39-13-204(i)(2) (1997)[4]; (2) "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," id. § 39-2-203(i)(5); (3) "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," id. § 39-2-203(i)(6); and (4) "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any . . . rape, robbery, . . . [or] kidnapping. . . .," id. § 39-2-203(i)(7). The trial court merged the premeditated murder and felony murder convictions into a single conviction and merged the remaining convictions into a single conviction for each offense and imposed concurrent, Range II sentences of forty-five years for robbery with a deadly weapon, fifty years for aggravated rape, and fifty years for

_____

[3](...continued)
of trial rather than the law in effect at the time of the murder. See State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994). At the time of the murder, Tennessee Code Annotated section 39-2-203(g) (1982) provided as follows:

> If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory circumstances have been proved by the state beyond a reasonable doubt, *and said circumstance or circumstances are not outweighed by any mitigating circumstances*, the sentence shall be death.

(Emphasis added.) Adhering to the trial court's instruction, the jury found that aggravating circumstances in this case outweighed any mitigating circumstances. While neither the trial court's instruction nor the jury's finding were in accord with the applicable law, the error was harmless because the finding that aggravating circumstances outweighed mitigating circumstances necessarily entailed a finding that no mitigating circumstances outweighed aggravating circumstances.

[4] The trial court erroneously instructed the jury in accordance with the version of this aggravating factor that was in effect as of the time of trial, and the jury's finding with respect to this factor coincided with such instruction. The trial court's instruction and the jury's finding relative to this aggravating factor should have been based upon the statutory law which was in effect at the time the offense was committed, see State v. Cauthern, 967 S.W.2d 726, 731-32 (Tenn. 1998), and which provided, "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person." Tenn. Code Ann. § 39-2-203(i)(2) (1982). We deem this error in the trial court's instruction and the jury's finding to be harmless because in finding that the elements of the prior offenses for which the defendant was convicted involved violence, the jury necessarily found that the felonies supporting the aggravating circumstances in this case involved "the use or threat of violence to the person." While we acknowledge this error, we have, throughout this opinion, for the sake of accuracy, quoted the language relied upon by the jury when referring to its finding in regard to this factor.

aggravated kidnapping. This effective fifty-year sentence was ordered to be concurrent to the sentence of death but consecutive to any sentences in other jurisdictions. After his conviction and sentencing, Mr. Henretta filed numerous motions for new trial, which were heard by the trial court on June 15, 2007, and denied by order of the trial court entered July 23, 2007.

The Court of Criminal Appeals affirmed the judgments of conviction and sentences, including the sentence of death. State v. Henretta, No. E2007-01750-CCA-R3-DD, 2009 WL 1025828 *24 (Tenn. Crim. App. Apr. 14, 2009).

**Analysis**

**Information Provided to the Jury**

At the sentencing phase of trial, the State made the following comments in its closing argument, urging the jury to impose the death sentence rather than incarceration for life:

> [Mr. Henretta] want[s] you to rationalize that if you as a taxpayer have to foot the bill here for him to stay in Tennessee, and he might or might not ever be executed, that you shouldn't do it, that it doesn't make a difference, just send him back to Pennsylvania. If you follow that logic, say for example you catch somebody out here selling drugs and they are prosecuted, convicted and put in jail and while they are in jail they are caught with possession of drugs again. So they are charged and they are prosecuted for that while they are in jail. Under this logic they wouldn't get anymore [sic] time or anymore [sic] punishment for that second crime. John Henretta has already gotten a life sentence for murder. If you follow that logic this crime is meaningless. There's what I would call the "Brer Rabbit" defense. You all, probably most of you have heard the children's story about Brer Rabbit. Brer Bear catches him and he's mad at him and he's going to strangle him, and Brer Rabbit says, "Oh, please do anything to me, strangle me, whatever, don't throw me in the briar patch." The whole time Brer Rabbit thinking that's where I live, I live in a briar patch, and if I can make him think that's terrible he will toss me in there and I will be home free. If you sentence him to life you throw him in the briar patch, and that is where he is happiest. He has lived and worked well in the prisons, he has gotten awards for his work in

-10-

prison, he goes to counseling for the sex offender stuff that he can pay attention to or not. You put him on death row, where he is under the tightest security he can be under, and where there is no chance he is going to escape and do something again, or injure some guard. That's what you should do.

Mr. Henretta asserts that the language employed by the prosecutor, specifically the phrase "You put him on death row, where he is under the tightest security he can be under, and where there is no chance he is going to escape and do something again, or injure some guard," constituted an argument for Mr. Henretta's future dangerousness.

Mr. Henretta contends that this argument violated the trial court's direction, given before jury selection, that proof regarding Mr. Henretta's future dangerousness or that Mr. Henretta is a danger in the penitentiary would not be admissible. Our review of the record reveals that defense counsel failed to object to this portion of the prosecutor's argument at the time it was made[5] and, therefore, the issue of the propriety of such argument is waived. Failure to object to a prosecutor's statements during closing argument results in waiver on appeal. State v. Reid, 164 S.W.3d 286, 344 n.3 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 250 (Tenn. 2005). Further, even if we disregard Mr. Henretta's waiver of this argument, we must find it to be without merit. The statements of the trial court prohibiting proof as to future dangerousness were made during a pre-trial motion hearing on February 6, 2002, and concerned a motion in limine pertaining to the admission of evidence of "[o]ther crimes, wrongs, or acts" pursuant to Tennessee Rule of Evidence 404(b), which provides that while "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait[, it] may . . . be admissible for other purposes." After the trial court initiated discussion as to when the motion might be heard, the following exchange took place between the trial court and defense counsel:

> [DEFENSE COUNSEL]: Judge, there's kind of a time pressure on the 404 in this respect: if it appears that what they are trying to prove is future dangerousness or if they are trying to prove that he is a danger in the penitentiary then is it legal –
>
> THE COURT: That would not be admissible.
>
> [DEFENSE COUNSEL]: Okay.

---

[5] The record also reveals that the propriety of the subject remarks of the prosecutor was not raised as an issue in a motion for new trial nor was it presented as an issue before the Court of Criminal Appeals.

THE COURT: That would not.

[DEFENSE COUNSEL]: But if that's the effect of it does that, we are not giving away what discussions we have had about ex parte witnesses, but there are ex parte witnesses, expert witnesses, who can testify about future dangerousness in the penitentiary.

THE COURT: That has nothing to do with it.

[DEFENSE COUNSEL]: Well, if they are going to – well, I don't mean to argue with the Court, but what if we say "Okay, don't worry about it and let the Judge rule on the day of the trial," and we get into all kind of arguments about future dangerousness and –

THE COURT: I'm not going to do that. What we are talking about, it may be offered to show modus operandi, lack of accident or mistake, intent, mental, and psychological capacity and planning.

[DEFENSE COUNSEL]: Okay.

THE COURT: If you will look at the rule they are going to have to show me that any prejudice would be substantially outweighed by that kind of proof.

We find nothing in the language of the trial court that would have prohibited the State from arguing the risk that Mr. Henretta would impose if not placed under the heightened security of death row. The referenced language of the trial court indicates that evidence of past crimes, wrongs, or acts would not be admissible for the purpose of proving that Mr. Henretta was of such a character that he would present a danger in prison. Mr. Henretta fails to point to any evidence in the record that was presented for that purpose nor do we find any such evidence, and the remarks made by the prosecutor in closing argument do not constitute evidence. See State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Rather, the prosecutor's remarks merely amounted to reasonable inferences that Mr. Henretta would present a future risk and were based on properly introduced evidence, including the sworn statement Mr. Henretta gave at Leavenworth, which established the violent nature of the murder and that it was committed after Mr. Henretta escaped from authorities in Pennsylvania where he was on parole. A prosecutor's closing argument may be based upon

-12-

reasonable inferences drawn from the evidence. State v. Banks, 271 S.W.3d 90, 131 (Tenn. 2008).

Second, Mr. Henretta argues that, in light of the prosecutor's "future dangerousness" argument, the trial court should have "reinforced" to the jury that parole for Mr. Henretta "was a practical impossibility." In support of this latter argument, Mr. Henretta relies upon Simmons v. South Carolina, 512 U.S. 154 (1994). In Simmons, after the defendant was found guilty of murder, the prosecutor made a generalized argument that the jury should consider the defendant's future dangerousness in deciding whether to impose the death penalty, stating that the question for the jury was "'what to do with [petitioner] now that he is in our midst'" and that a verdict for death would be "'an act of self-defense.'" Id. at 157 (alteration in original). Under the circumstances, if given life imprisonment, the defendant would not have been available for parole under state law, and he requested that the trial judge instruct the jury that life imprisonment under state law did not the carry the possibility that the defendant would be released on parole. The judge refused to give this instruction, and when the jury sent a note to the judge specifically inquiring as to whether a life sentence would carry the possibility of parole, the judge instructed the jury that it should not consider parole eligibility in reaching its verdict and that life imprisonment should be understood in its plain and ordinary meaning. The United States Supreme Court found that the trial court's failure to instruct the jury as to the defendant's parole ineligibility constituted a violation of due process, holding as follows:

> [I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

Id. at 168-69. Mr. Henretta acknowledges that in 1988, when Ms. Crabtree was killed, Tennessee statutory law provided that only two possible punishments were available for first degree murder, death or imprisonment for life (*with* the possibility of parole). Tenn. Code Ann. § 39-2-202(b) (1982). It was not until 1993 that the legislature added a third possible punishment of life *without* the possibility of parole. Tenn. Code Ann. § 39-13-202(c) (Supp. 1993). He also acknowledges that in State v. Bush, 942 S.W.2d 489, 503 (Tenn. 1997), we held that Simmons did not apply in a state where parole was available. However, Mr.

Henretta contends that although he was theoretically eligible for a life sentence with the possibility of parole under Tennessee law, he was not subject to parole as a matter of fact because as of the time of his trial in Tennessee, he had already been sentenced to life without the possibility of parole in Pennsylvania.

We believe that Mr. Henretta misapprehends the Court's holding and underlying rationale in Simmons. In that case, the defendant's parole eligibility was relevant in answering the State's argument that the defendant would present a future threat to society for the obvious reason that if the defendant were to be released on parole, society would be exposed to his future criminal conduct. As the Court stated, "the jury reasonably may have believed that [the defendant] could be released on parole if not . . . executed [ ] [and] [t]o the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing [the defendant] to death and sentencing him to a limited period of incarceration." Simmons, 512 U.S. at 161. By contrast, in the instant matter, the prosecutor did not argue that Mr. Henretta would present a future danger to society if sentenced to life in prison with the possibility that he might be released but instead, that he might "escape and do something again, or injure some guard." The posited threats of escape or injuring a guard are not contingent upon or consistent with Mr. Henretta's release from prison on parole but rather assume Mr. Henretta's continuing incarceration. Thus, presenting the jury with information that an alternative sentence to death is life without parole would not in any way undercut the State's argument that Mr. Henretta poses an intra-prison threat or might escape if not sentenced to death. In the language of the Simmons court, information regarding Mr. Henretta's parole ineligibility would not "allow[] the defendant to 'deny or explain' the showing of future dangerousness." 512 U.S. at 169. The instant matter is further distinguishable from Simmons in that the defendant in Simmons was precluded from presenting proof that he would not be eligible for parole, whereas Mr. Henretta introduced documentation into evidence showing that he was currently serving a life sentence in Pennsylvania without possibility of parole. Defense counsel accentuated this fact to the jury on multiple occasions, stating, for example: "You know from the evidence that [Mr. Henretta] is currently serving a sentence of life without parole and by stipulation and agreement of the state and the written documents you have seen that means life entirely, no parole, no out, he leaves in a box"; and

> Each of you has seen the documentation from Pennsylvania.
> [Mr. Henretta] serves his whole sentence in Pennsylvania, which
> is life without parole, without getting out, and then if we have
> to bring him back here and he can serve the next [sic] of his next
> life if he had one.

Finally, Mr. Henretta contends that the trial court erred in failing to allow defense counsel to comment on the fact that he would receive a life sentence if the jury failed to reach unanimous agreement to impose the death penalty. With respect to this third argument, applicable statutory law at the time of trial provided as follows:

> (f) If the jury unanimously determines that no statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, or if the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proved by the state beyond a reasonable doubt but that said circumstance or circumstances are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment. . . .

> (g) If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death . . . .

> (h) If the jury cannot ultimately agree as to punishment, the judge shall dismiss the jury and the judge shall impose a sentence of life imprisonment. The judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on the effect of the jury's failure to agree on a punishment.

Tenn. Code Ann. § 39-2-203(f)-(h) (1982). Mr. Henretta maintains that the last sentence of subsection (h), which prohibits the trial court and attorneys from advising the jury that the consequence of its failure to reach a unanimous decision as to either a death sentence or a sentence of life will result in a sentence of life without parole, is unconstitutional and in conflict with the Court's holding in Simmons requiring that the jury be informed that a defendant is ineligible for parole after the defendant's future dangerousness has been placed at issue by the prosecution.

Although Mr. Henretta argues that adherence to subsection (h) conflicts with the Supreme Court's decision in Simmons requiring that the jury be informed that a defendant is parole ineligible after the defendant's future dangerousness has been placed at issue by the prosecution, he has also acknowledged that controlling state statutory law at the time of his

-15-

trial and sentencing provided that the punishments for first degree murder were either death or imprisonment for life *with* the possibility of parole. As we have noted, in Bush, we found Simmons inapplicable under these circumstances, stating "[s]ince Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, Simmons does not require that the jury be given information about parole availability." Bush, 942 S.W.2d at 503. Mr. Henretta further argues that the instruction that the jury must unanimously agree in order to sentence a defendant to life imprisonment is contrary to the law, and, therefore, unconstitutional, because under subsection (h) a life sentence will result even in the absence of jury unanimity. This argument has been rejected by this Court on prior occasion and is of no merit. See State v. Cribbs, 967 S.W.2d 773, 796 (Tenn. 1998); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Barber, 753 S.W.2d 659, 670-71 (Tenn. 1988).

## Juror with Newspaper

Next, we consider Mr. Henretta's argument that the trial court failed to accord him the full measure of the heightened standard of due process to which a capital defendant is entitled by denying his motion for mistrial upon allegation that a juror was witnessed reading a newspaper. With regard to this issue, Mr. Henretta merely states that "Juror Edred Dayle Durham was seen with a newspaper and the Defense raised the issue of whether as he saw [sic] that the objection to his having a copy of a newspaper (probably USA Today) came from the Defense team. The motion for mistrial was not granted." Mr. Henretta presents no authority or argument as to why the trial court's failure to grant his motion was erroneous and constituted a denial of due process. Accordingly, to the extent that he has even articulated an issue, that issue is waived. See Hawkins v. Hart, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001). Whether to grant a motion for mistrial is a matter within the trial court's discretion. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009); State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003). Notwithstanding Mr. Henretta's waiver of this issue, we have examined the record in this case and find no evidence that the trial court abused its discretion in denying Mr. Henretta's motion for mistrial.

## Jury Instructions on Intoxication

During the sentencing phase of trial, the trial court instructed the jury that it should consider as a mitigating circumstance whether Mr. Henretta's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of voluntary intoxication. However, the trial court did not instruct the jury as to the defense of intoxication as to intent during the guilt/innocence phase of trial. Although Mr. Henretta did not complain of this omission during trial and did not raise it in his motion for new trial or present it as an issue before the Court of Criminal Appeals, he urges us to address it as a matter of plain error.

-16-

Appellate review of a patently incomplete instruction is available in capital cases despite the defendant's failure to raise the issue below under the plain error doctrine. State v. Bledsoe, 226 S.W.3d 349, 353-54 (Tenn. 2007); State v. Hugueley, 185 S.W.3d 356, 382 (Tenn. 2006); State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994), abrogated on other grounds by Saylor, 117 S.W.3d at 246. As set forth in Rule 36(b) of the Tennessee Rules of Appellate Procedure, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." The following five elements must be satisfied before an alleged error qualifies for review as plain error:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (citations and footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the Adkisson five-element test). Our review of an issue under the plain error doctrine is contingent upon all five of these elements having been satisfied, and if any one of the elements is not met, we need not consider the other four in denying relief.

At the time the offenses were committed in this case, Tennessee statutory law defined first degree murder as follows:

> Every murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any murder in the first degree, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or the unlawful

throwing, placing or discharging of a destructive device or bomb, is murder in the first degree.

Tenn. Code Ann. § 39-2-202(a) (1982). Further, it was well settled at the time of the commission of the offenses in this case that proof of intoxication constituted a defense to first degree murder:

> If the accused is so intoxicated that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree; and, even when an intoxicated defendant is capable of forming specific intent, his drunkenness may be considered in determining whether he specifically intended the particular act for which he is on trial.

State v. Adkins, 653 S.W.2d 708, 713 (Tenn. 1983) (citing State v. Bullington, 532 S.W.2d 556 (Tenn. 1976)). In accord, this state's pattern jury instruction regarding intoxication provides in part as follows:

> Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state.
>
> In this case, the state must prove beyond a reasonable doubt the required culpable mental state of the defendant which is [insert definition of specific mental state required for charged and included offenses].
>
> If you find that the defendant was intoxicated to the extent that *[he] [she]* could not have possessed the required culpable mental state, then *[he] [she]* cannot be guilty of the offense charged.

T.P.I.-Crim. 40.02 (footnotes omitted).

Mr. Henretta argues that the trial court erred in failing to give an instruction apprising the jury about intoxication as a defense. As we recently reiterated in State v. Hatcher, 310 S.W.3d 788, 815 n.16 (Tenn. 2010), when a defendant is charged with an offense that requires a culpable mental state, such as first degree murder, "a jury instruction about a defendant's alleged voluntary intoxication at the time he or she committed the offense under consideration is required only if the intoxication was such that it compromised the

-18-

defendant's capacity for whatever culpable mental state the offense required." Therefore, to show that the trial court breached a clear rule of law for the second element of the plain error analysis, Mr. Henretta must show that the trial court heard evidence that Mr. Henretta was intoxicated to the extent that it compromised his capacity to create the culpable mental state.

Mr. Henretta points to the testimony of Agent Wilkins, the closing arguments of Assistant District Attorney Sandra Donaghy, and the testimony of Drs. Walker and Bernet. None of the statements Mr. Henretta identifies, however, required the trial court to provide a jury instruction on intoxication. The only testimony provided by Agent Wilkins pertaining to the issue of Mr. Henretta's intoxication consisted of Agent Wilkins's recitation of Mr. Henretta's sworn confession: "We were drinking and stuff at some bar down the corner from the Salvation Army Store. We hung around about two hours or so and went back by the store and hung around till she closed at 4:30 or 5:00 PM." This statement merely constituted proof that Mr. Henretta was drinking on the afternoon of the crime, not that he was intoxicated or that he lacked the capacity to form the mental state required to commit first degree murder.

Furthermore, the closing argument of Assistant District Attorney Donaghy also did not require the trial court to give an instruction on intoxication. Remarks made by a prosecutor during closing argument do not constitute proof. Woods, 806 S.W.2d at 211. Therefore, her statements are insufficient to show that the trial court was required to give an instruction. Finally, Drs. Walker and Bernet did not testify until the sentencing phase of trial. Accordingly, their testimony was not before the trial court when it charged the jury on guilt/innocence. Mr. Henretta has failed to show that the trial court breached a clear and unequivocal rule of law when it failed to provide a jury instruction on intoxication, and thus he failed to show plain error.

### Delay in Filing Notice of Intent to Seek Death Penalty

Mr. Henretta argues that the delay between his confession and the filing of the notice to seek the death penalty resulted in a violation of the heightened standard of due process required in a capital case. He asserts that between the time of his confession and the filing of the death penalty notice, his brother Terrance, who purportedly could have provided mitigation testimony, died.[6] Mr. Henretta contends that the trial court erred in failing to

---

[6] Mr. Henretta incorrectly states that Terrance's death occurred in the interim between the confession and indictment and the death penalty notice. Terrance died on October 27, 1998, at least fourteen months after the indictment and death penalty notice were filed and over a year after the public defender's office was

(continued...)

dismiss the death penalty notice based upon this delay and, therefore, that reversal of his sentence is warranted.

Mr. Henretta confessed in writing to the robbery, rape, and murder of Ms. Crabtree on February 11, 1994. In April of 1997, the FBI issued its report concluding that DNA from the crime scene matched DNA extracted from the samples obtained from Mr. Henretta at Leavenworth. On August 20, 1997, Mr. Henretta was indicted and, on the same date, the State gave notice of its intent to seek the death penalty. The defendant's trial began on April 1, 2002.

Tennessee Rule of Criminal Procedure 12.3(b), which became effective August 22, 1984, requires that notice of intent to seek the death penalty be filed not less than thirty days before trial:

> Where a capital offense is charged in the indictment or presentment and the district attorney intends to ask for the death penalty, *written notice thereof shall be filed not less than thirty (30) days prior to trial*. If the notice is filed later than this time, the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial. The notice shall specify that the State intends to seek the death penalty and the notice shall specify those aggravating circumstances the State intends to rely upon at a sentence hearing. Specification may be complied with by a reference to the citation of the circumstance.

Tenn. R. Crim. P. 12.3 (1997) (emphasis added). The State certainly complied with the time limitation under this Rule. The State was required to file the notice of its intent to seek the death penalty at least thirty days before trial and, in fact, filed such notice almost five years prior to trial. Because the State fully complied with the Rule, Mr. Henretta's motion to dismiss the notice of intent to seek the death penalty based upon alleged delay in its filing was properly denied by the trial court.

### Propriety of Mr. Henretta's Transfer From Leavenworth

The next questions presented for our review pertain to the means by which Mr. Henretta was transferred from Leavenworth to the Bradley County jail for arraignment in 1997.

---

[6](...continued)
appointed as Mr. Henretta's counsel by order of October 6, 1997.

By letter dated August 26, 1997, Assistant Attorney General Sandra Donaghy advised the Records Office at Leavenworth that indictments were pending against Mr. Henretta in Bradley County and that "temporary custody is needed for service of process and disposition of the charges pending against him." The letter further states that this temporary custody is being sought "through Writ of Habeas Corpus Ad Prosequendum." The letter requests that Bradley County be allowed to assume custody of Mr. Henretta on October 3, 1997. This letter was accompanied by a document entitled "WRIT OF HABEAS CORPUS AD PROSEQUENDUM" entered by the trial court on August 28, 1997, and addressed to Mr. Henretta; Bradley County Sheriff Dan Gilley; and the Records Office at Leavenworth. The document recites that the trial court has been advised that Leavenworth and the Attorney General's Office "have agreed to honor this Writ of Habeas [C]orpus Ad Prosequendum" and that arrangements have been made between [Leavenworth] and the Bradley County Sheriff's Department for the latter to take custody of Mr. Henretta. The document orders the Bradley County Sheriff's Department to take temporary custody of Mr. Henretta at Leavenworth and, thereafter, to bring him before the trial court for purposes of service of process and disposition of pending charges. The letter was also accompanied by an August 28, 1997, order directing the trial court clerk to issue the "writ of habeas corpus prosequendum" to Sheriff Gilley to receive Mr. Henretta into custody and bring him before the trial court. The record shows that in accordance with these documents, Leavenworth temporarily relinquished custody of Mr. Henretta to Bradley County officials on or about October 3, 1997; that he was incarcerated in the Bradley County jail for one month, during which time he was arraigned on the charges in this case; and that he was transferred back to Leavenworth on or about November 5, 1997.

Mr. Henretta contends that the letter from Assistant Attorney General Donaghy, the document designated to be a writ of habeas corpus ad prosequendum, and the associated order addressed to the trial court clerk collectively constituted a detainer. Consequently, Mr. Henretta argues, the transfer of custody to Tennessee authorities was subject to the Interstate Compact on Detainers ("the Compact"), codified at Tennessee Code Annotated sections 40-31-101 to -108 (2006). The Compact is an agreement among the states, the District of Columbia, Puerto Rico, the Virgin Islands, and the United States, see Carchman v. Nash, 473 U.S. 716, 719 (1985), which, through "cooperative procedures," seeks "to encourage the expeditious and orderly disposition of . . . charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." Tenn. Code Ann. § 40-31-101, art. I. The so-called "anti-shuttling" provision of the Compact provides as follows:

> If trial is not had on any indictment, information or complaint
> contemplated hereby prior to the prisoner's being returned to the
> original place of imprisonment pursuant to article V(e) hereof,

such indictment, information or complaint shall not be of any
further force or effect, and the court shall enter an order
dismissing the same with prejudice.

Id. § 40-31-101, art. IV(e). Mr. Henretta argues that the charges against him should have
been dismissed pursuant to this provision because he was returned to Leavenworth without
having been tried. The State contends, in accordance with the ruling of the Court of Criminal
Appeals, that Mr. Henretta was transferred pursuant to a writ of habeas corpus ad
prosequendum not subject to the Compact.

In support of his contention that he was transferred from Leavenworth by detainer,
Mr. Henretta cites State v. Moore, 774 S.W.2d 590 (Tenn. 1989). In that case, the defendant
pled guilty to multiple counts of a presentment returned against her in Tennessee, charging
her with various offenses, including forgery and passing forged checks. She reserved the
question of whether the charges should be dismissed upon the ground that the State had
violated Article III of the Compact, which provides in pertinent part as follows:

> Whenever a person has entered upon a term of imprisonment in
> a penal or correctional institution of a party state, and whenever
> during the continuance of the term of imprisonment there is
> pending in any other party state any untried indictment,
> information or complaint on the basis of which a detainer has
> been lodged against the prisoner, the person shall be brought to
> trial within one hundred eighty (180) days after having been
> caused to be delivered to the prosecuting officer and the
> appropriate court of the prosecuting officer's jurisdiction written
> notice of the place of the person's imprisonment and request for
> a final disposition to be made of the indictment, information or
> complaint . . . .

Tenn. Code Ann. § 40-31-101, art. III(a). A warrant for the arrest of the defendant was
issued by Tennessee officials in October of 1982; however, it was never served and no action
was taken until May 1985 when Tennessee officials learned that she was incarcerated in
Florida. Tennessee officials then sent Florida prison officials a certified copy of the warrant
and a cover letter requesting that the warrant be placed as a detainer against her. Before
receipt of this request, Florida officials had received similar requests from Indiana and other
states. Florida officials notified the defendant of the pending Tennessee charges, and, on
August 21, 1985, the defendant executed documentation requesting a final disposition of the
Tennessee charges. However, this and other detainer forms were not sent to Tennessee until
May 23, 1986, after the defendant was tried and convicted of charges also pending in

Indiana. Consequently, Tennessee officials did not learn of her request for final disposition of the Tennessee charges until receipt of the detainer forms from Florida on June 2, 1986. On June 26, 1986, the defendant permanently left the custody of Florida and was transferred to Indiana to begin serving her sentence there. After her transfer to Indiana, Tennessee obtained custody of the defendant under Article IV of the Compact, and the charges against her in Tennessee were properly disposed of in accord with Article IV of the Compact. Upon review, we found no merit in the defendant's argument that the 180-day period for disposition of the Tennessee charges following her request commenced on August 21, 1985, the day she signed the request, and that by the time Tennessee officials were notified of her execution of this request, the 180 day period had already expired. Instead, we determined that it is the prisoner's responsibility and burden to give notice of a request for disposition of charges under Article III, and "[t]he receiving state cannot be charged with the burden of requesting or compelling temporary custody from the sending state until it has received notice that the prisoner has made his or her request." Moore, 774 S.W.2d at 594.

In arriving at our decision in Moore, we discussed whether an unserved arrest warrant, as was implemented in that case, would trigger the provisions of the Compact. Acknowledging that the Compact itself contains no definition of "detainer," we observed that "detainer" has been defined by the federal courts on various occasions. Id. at 596-97. In United States v. Mauro, 436 U.S. 340, 359 (1978), the United States Supreme Court observed that House and Senate reports related to the Compact "explain that [a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." (internal quotation omitted) (alteration in original). In Carchman v. Nash, "detainer" was defined as "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent." 473 U.S. at 719. And in United States v. Dixon, 592 F.2d 329, 332 n.3 (6th Cir. 1979), the Sixth Circuit presented the following definition of "detainer":

> A detainer is simply a notice filed with the institution in which a prisoner is serving a sentence, advising that the prisoner is wanted to face pending criminal charges elsewhere, and requesting the custodian to notify the filing jurisdiction prior to releasing the prisoner. Filing a detainer is an informal process that generally can be done by any person who has authority to take a prisoner into custody. Furthermore, a detainer remains lodged against a prisoner without any action being taken on it.

-23-

We also noted in Moore that throughout the Compact, there is reference to "untried indictments, informations or complaints and to detainers based thereon," 774 S.W.2d at 595, and we stated that "the better view and the more consistent interpretation of the Compact is that an untried 'indictment, information or complaint' is a charging instrument upon which the requesting state may proceed to trial, and not merely a warrant of arrest," id. at 597. However, in consideration of "the general practice of prosecuting officials in this and other states," id., we concluded that an unserved arrest warrant will suffice as a detainer, triggering provisions of the Compact. Alluding to our analysis in Moore and our conclusion that the warrant in that case constituted a detainer, Mr. Henretta asserts that in the instant matter, "[t]he Order and Writ together with the letter were simply a notice filed with the Federal Penal Institution in Kansas advising that the prisoner was wanted in Tennessee" and that, like the warrant in Moore, these constituted a detainer. We do not agree and find that the procedure that was utilized to transfer the defendant in Moore is readily distinguishable from that employed in the present matter.

In Mauro, the Supreme Court held that a writ of habeas corpus ad prosequendum is not a detainer for purposes of the Compact, 436 U.S. at 361, and Tennessee courts agree. See State v. Brown, 53 S.W.3d 264, 285 (Tenn. Crim. App. 2000); Metheny v. State, 589 S.W.2d 943, 945 (Tenn. Crim. App. 1979). The Mauro Court distinguished a writ of habeas corpus ad prosequendum from a detainer as follows:

> Unlike a writ of habeas corpus *ad prosequendum* . . . , a detainer may be lodged against a prisoner on the initiative of a prosecutor or law enforcement officer. Rather than requiring the immediate presence of the prisoner, a detainer merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison.

436 U.S. at 358 (footnote omitted). The Court explained that the Compact was implemented to expedite disposal of detainers and thereby address problems arising from the fact that unresolved detainers create psychological difficulties for the prisoner and administrative obstacles for prison administrators, as well as sentencing dilemmas for the courts. It explained:

> [P]rison administrators were "thwarted in [their] effort[s] toward rehabilitation [because t]he inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program." Furthermore, the prisoner was often deprived of the ability to take advantage of many of

-24-

the prison's programs aimed at rehabilitation, merely because there was a detainer lodged against him. . . . [T]he existence of detainers [also] presented problems in sentencing; when detainers had previously been filed against the defendant, the sentencing judge would hesitate to give as long a sentence as he thought might otherwise be indicated, there being a possibility that the defendant would be required to serve subsequent sentences. . . .

The adverse effects of detainers that prompted the drafting and enactment of the Agreement are thus for the most part the consequence of the lengthy duration of detainers. . . . For these reasons the stated purpose of the Agreement is "to encourage the *expeditious* and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints."

Id. at 359-60. (citations omitted). The Court noted that because a writ of habeas corpus is executed immediately, the problems associated with a detainer – which, but for the requirements of the Compact, might linger unresolved for long periods of time – do not arise. In Moore, Tennessee officials specifically requested that the warrant mailed to prison officials in Florida be treated as a detainer against the defendant. See 774 S.W.2d at 592. By contrast, Ms. Donaghy's letter to prison officials at Leavenworth specifically stated that temporary custody of Mr. Henretta was being sought through a writ of habeas corpus ad prosequendum for purposes of service of process and disposition in the case against him and set forth a date and time, October 6, 1997 at 9:00 a.m., that he would be taken before the Bradley County trial court. Her letter was accompanied by a document entered by the trial court that is specifically entitled "WRIT OF HABEAS CORPUS AD PROSEQUENDUM," the contents of which are consistent with its title. The second document that accompanied the letter was an order directing the clerk of the court "to issue a writ of habeas corpus ad prosequendum" to the Bradley County sheriff. It is clear from the letter and the two documents that accompanied it that the procedure utilized to obtain temporary custody of Mr. Henretta sought to bring about his immediate transfer and, therefore, the procedure employed was not fraught with the lengthy indeterminacy that the Compact is intended to prevent. By its nature, the writ of habeas corpus ad prosequendum was to be executed expeditiously. There is nothing in the procedure implemented in the instant matter, either in the format of the documents used or in their effect, that warrants their being construed as a detainer subject to the Compact. Accordingly, Mr. Henretta's argument is without merit.

It appears that Mr. Henretta argues in the alternative that if he was transferred from Leavenworth pursuant to a writ of habeas corpus ad prosequendum, the writ was void and without effect because 1) the trial court did not have constitutional or statutory authority to issue a writ against an individual in Kansas; 2) under Tennessee Code Annotated section 29-21-102 (1980), Tennessee courts do not have jurisdiction over federal prisoners; 3) the writ and order were not granted pursuant to a notarized petition and affidavit pursuant to Tennessee Code Annotated section 29-21-107 (1980); and 4) Mr. Henretta was never served with the writ pursuant to Tennessee Code Annotated section 29-21-112 (1980).

First, Mr. Henretta contends that Tennessee courts do not have authority to issue a writ of habeas corpus ad prosequendum against an individual incarcerated in a federal prison in Kansas. We do not agree. As the Court of Criminal Appeals correctly stated, "[t]he very purpose of the common law writ of *habeas corpus ad prosequendum* requires that it be issued against the prisoner by a court located in a different jurisdiction." Henretta, 2009 WL 1025828, at *8. Long ago, in Ponzi v. Fessenden, 258 U.S. 254 (1922), the United States Supreme Court recognized that a state has the right to obtain temporary custody of a federal prisoner by writ of habeas corpus ad prosequendum as a matter of "reciprocal comity and mutual assistance to promote due and orderly procedure." Id. at 259; see also Carbo v. United States, 364 U.S. 611, 621 (1961) (noting that the writ of habeas corpus ad prosequendum is recognized as a matter of "comity . . . necessary between sovereignties in the administration of criminal justice in our federal-state system . . . affording . . . respect and courtesy to the laws of the respective jurisdictions"); Robinson v. Owens, C.A. 4:07-3118-HMH-TER, 2008 WL 783782, at *8 (D.S.C. Mar. 20, 2008) ("Without relinquishing its priority, a sovereign may loan a defendant in its custody to another sovereign for criminal proceedings in the receiving jurisdiction by way of a writ of habeas corpus ad prosequendum." (citing Causey v. Civiletti, 621 F.2d 691, 693 (5th Cir. 1980)). Furthermore, federal regulations specifically authorize federal prisons to entertain the transfer of a federal prisoner to state officials as follows:

> The Bureau of Prisons will consider a request made on behalf of a state or local court that an inmate be transferred to the physical custody of state or local agents pursuant to state writ of habeas corpus *ad prosequendum* or *ad testificandum*. The Warden at the institution in which the inmate is confined is authorized to approve this transfer in accordance with the provisions of this rule.

28 C.F.R. § 527.30 (1997). The Ponzi Court additionally noted that the voluntary transfer of custody by one sovereign to another provides a defendant with no ground for objection:

-26-

One accused of crime has a right to a full and fair trial according to the law of the government whose sovereignty he is alleged to have offended, but he has no more than that. He should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial. He may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order that the other may also subject him to conviction of crime against it.

. . . .

But it is argued that when the prisoner is produced in the [state] superior court, he is still in the custody and jurisdiction of the United States, and that the state court cannot try one not within its jurisdiction. This is a refinement which if entertained would merely obstruct justice. The prisoner when produced in the superior court in compliance with its writ is personally present. He has full opportunity to make his defense . . . . The trial court is given all the jurisdiction needed to try and hear him by the consent of the United States . . . . This arrangement of comity between the two governments works in no way to the prejudice of the prisoner or of either sovereignty.

258 U.S. at 265-66.

Mr. Henretta also argues that the writ of habeas corpus ad prosequendum failed to comply with various sections of Chapter 21 of Title 29 of the Tennessee Code Annotated, which provides that "[a]ny person imprisoned or restrained of liberty, under any pretense whatsoever, except in cases specified in § 29-21-102, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment and restraint." Tenn. Code Ann. § 29-21-101(a). First, Mr. Henretta contends that Tennessee courts do not have habeas corpus jurisdiction over federal prisoners under Tennessee Code Annotated section 29-21-102, which states as follows:

Persons committed or detained by virtue of process issued by a court of the United States, or a judge thereof, in cases where such judges or courts have exclusive jurisdiction . . . by the

-27-

commencement of suits in such courts, are not entitled to the benefits of this writ.

Next, Mr. Henretta contends that the writ was not granted pursuant to a notarized petition and affidavit, as required by Tennessee Code Annotated section 29-21-107, which provides in subsection (a) that "[a]pplication for the writ shall be made by petition, signed either by the party for whose benefit it is intended, or some person on the petitioner's behalf, and verified by affidavit." Finally, Mr. Henretta contends that he was never served with a copy of the writ as required by Tennessee Code Annotated section 29-21-112, which at subsection (a) states that "[t]he proper mode of service is by leaving a copy of the original writ with the defendant." We believe Mr. Henretta misapprehends the nature of the writ of habeas corpus employed in this case and, therefore, the relevance of the cited statutes.

In Ex parte Bollman, 8 U.S. (4 Cranch) 75, 95 (1807), Chief Justice John Marshall clarified that although "writ of habeas corpus" is a "generic term [ ] and includes every species of that writ[,] . . . when used singly – when we say the writ of habeas corpus, without addition, we most generally mean that great writ [the writ of habeas corpus ad subjiciendum]." The writ of habeas corpus ad subjiciendum is the writ "traditionally used to test restraint of liberty." Carbo, 364 U.S. at 615. As quoted above, Tennessee Code Annotated section 29-21-101 allows the prosecution of "a writ of habeas corpus[ ] to inquire into the cause of . . . imprisonment and restraint," and this Court has recognized that that section and the rest of Chapter 21 constitute statutory regulation of the "great writ" of habeas corpus ad subjiciendum. May v. Carlton, 245 S.W.3d 340, 344 (Tenn. 2008). Chapter 21 does not govern a writ of habeas corpus ad prosequendum and, thus, Mr. Henretta's reliance upon sections 29-21-102, 29-21-107, and 29-21-112 is misplaced.

### Search Warrant

Next, Mr. Henretta argues that the search at Leavenworth on February 11, 1994 – at which time he gave blood, hair, and saliva samples and after which he confessed to robbing, raping, and murdering Ms. Crabtree – was defective because he was not given a copy of the search warrant at the time of the search and because the warrant that was eventually served upon him was incomplete.

As noted, in early 1994, Lieutenant Chastain learned from police in Philadelphia, Pennsylvania, that Michael Goodhart had written a letter to a federal judge indicating that Mr. Goodhart may have been involved in the murder of Ms. Crabtree. Information subsequently obtained from Mr. Goodhart by Lieutenant Chastain confirmed Mr. Goodhart's involvement and led Lieutenant Chastain to conclude that Mr. Henretta may also have been involved. Thereafter, Lieutenant Chastain and Agent Wilkins traveled to Texas to speak

further with Mr. Goodhart and then continued on to Kansas, where on February 10, 1994, a Leavenworth County judge issued a search warrant to obtain samples of Mr. Henretta's blood, saliva, and hair. In their affidavit filed in support of the warrant application, Agent Wilkins and Lieutenant Chastain attested as follows:

> On January 11, 1994, Lieutenant Danny Chastain of the Cleveland Tennessee Police Department observed an NCIC teletype from Detective Ballentine of the Philadelphia, Pennsylvania Police Department, directed to any Tennessee Police Agency having an unsolved homicide involving a female employee of a store that was murdered by a cut to the throat sometime in November, 1988, and requesting they respond in reference to a possible lead. Subsequent investigation by Lieutenant Chastain revealed the attached copy of a letter sent by Michael S. Goodhart to Federal Judge Joseph L. McGlynn Jr., in Philadelphia, Pennsylvania, December 20, 1993. On January 20, 1994, Lieutenant Chastain contacted the aforesaid inmate Michael Goodhart by telephone at the Federal Correctional Institute in Bastrop, Texas. Goodhart advised Lieutenant Chastain that the murder he witnessed and referred to in the aforesaid letter occurred in a Thrift Store where used clothing is sold, and that the murder occurred approximately between 5:00 p.m. and 6:00 p.m. in the evening after the store had closed. Goodhart also stated that the Thrift Store was located just a couple of blocks from the Courthouse in the downtown section of the city. Goodhart further stated that he was present when the murder occurred and that he knew who had committed the murder and the location of this man. Goodhart advised that the man is in the penitentiary. He did not state the [n]a[m]e of this individual nor his location to Lieutenant Chastain. The Salvation Army Thrift Store at the time of the Crabtree murder was located approximately two blocks from the Courthouse Square in Cleveland, Tennessee.

> Further investigation by Lieutenant Chastain and Special Agent Wilkins has revealed that Michael Goodhart was arrested along with John Henretta, white male, DOB: 2-12-43, FBI # 767995D, on December 3, 1988, outside of Little Rock, Arkansas. Goodhart and Henretta were wanted by the FBI for a Kidnapping that occurred on or about the day after

Thanksgiving, in 1988, in Pennsylvania. The weapon used in the kidnapping was a knife. John Henretta has committed and been convicted of rapes and one homicide similar to the Francis Rose Crabtree case in the past. He is a suspect in another homicide similar to the Rose Crabtree murder.

The affiants have been advised by Chief Charles Abraham of the New Castle, Pennsylvania Police Department that on November 14, 1988, Henretta and Goodhart raped and robbed a waitress in New Castle, Pennsylvania as they were fleeing a halfway house. The weapon used in this incident was a knife. The victim was able to escape. Henretta and Goodhart fled the area. On or about the day after Thanksgiving, 1988, in Philadelphia, Pennsylvania, Henretta and Goodhart kidnapped a lady at knifepoint and stole her car. This victim was released a day or so later in or near Richmond, VA. On December 3, 1988, Henretta and Goodhart were arrested near Little Rock, Arkansas. Cleveland, Tennessee is located approximately 30 miles north of Chattanooga, Tennessee along Interstate 75. The Crabtree murder occurred at a time when Henretta and Goodhart were fleeing from crimes committed in Pennsylvania and Virginia and according to Goodharts' [sic] letter traveling through Tennessee. Cleveland, Tennessee is located in routes between Virginia and Arkansas.

Blood, head hair, pubic hair and saliva samples are needed from John Henretta for comparison with evidence recovered from the crime scene. We believe an analysis of these specimens, when compared with seminal stains and hair found on the victim, Francis Rose Crabtree, the victim's clothing or at the crime scene will show similar blood, DNA or other serological characteristics, and as such will constitute evidence that John Henretta committed the offenses of Murder, Aggravated Rape and Especially Aggravated Robbery.

On February 11, 1994, Agent Wilkins and Lieutenant Chastain met with Mr. Henretta at Leavenworth. Agent Wilkins was in possession of a copy of the search warrant, advised Mr. Henretta that they were there to investigate a murder that had occurred in Tennessee in 1988, and explained that the purpose of the search warrant was to collect blood, hair, and saliva samples from him. The samples were taken, and shortly thereafter, Mr. Henretta made

his confession. He was not given a copy of the search warrant at the time of its execution, and the return shows that, instead, a copy of the warrant was left with "Bill Thomas, SIS." Mr. Henretta testified that SIS officers are "like a police within an institution. They police the police and the convicts, like the internal affairs in a police department."[7] In any event, it is not disputed that Bill Thomas was an officer employed by the prison, and the copy of the warrant was received by Mr. Henretta through the prison's mail system about one week after the search. The copy received by Mr. Henretta consisted of one page without any attachments. Mr. Henretta contends that the search was defective and the evidence obtained at the time of the search should be suppressed because he was not served with a copy of the warrant at the time of the search and the copy of the warrant with which he was provided did not include a copy of the Goodhart letter referenced in the affidavit.

The standard governing our review of a suppression issue is well established. We are bound by factual findings made by the trial court at the conclusion of the suppression hearing unless the evidence preponderates to the contrary. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of witness credibility and the weight and value of the proof as well as the resolution of conflicts in proof are all matters entrusted to the trial judge as the trier of fact, and "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. We review the trial court's application of the law to the facts de novo without a presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

In support of his argument that he was required to be given a copy of the warrant at the time of its execution, Mr. Henretta cites Rule 41(c) of the Tennessee Rules of Criminal Procedure, which at the time of the search, provided that "the failure of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being served, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure." Tenn. R. Crim. P. 41(c) (1994). The trial court ruled that service was satisfactory under the "where possible" provision of the rule, finding that the "the officers did as instructed by prison officials and left a copy for the defendant because they believed that they could not personally hand it to [Mr. Henretta]." There is no proof in the record showing that prison rules precluded the executing officers from personally handing Mr. Henretta a copy of the warrant, and the State

_____

[7] Although it is not stated in the record what SIS stands for, our independent research indicates that it is the abbreviation for "special investigative supervisor."

presented no testimony otherwise as to why the warrant was not personally served upon the defendant when executed. Mr. Henretta attested that there was no rule prohibiting officers from handing him a copy of the warrant. Based upon State v. Roach, No. 4, 1989 WL 22815 (Tenn. Crim. App. Mar. 15, 1989), we conclude that even if there was no prison rule forbidding such personal service at the time of the search, the method of service utilized was adequate to satisfy the requirements of Rule 41(c). In Roach, the defendant was arrested and taken to jail while police officers were searching his premises pursuant to a search warrant. The defendant was not served with a copy of the warrant at the time of the search. However, upon completion of the search, an officer took a copy of the warrant to the jail where the defendant was incarcerated and placed the copy in the defendant's property bag. Later, the warrant was transmitted to the defendant's attorney by the jailor in charge of the property bag. The intermediate court held that delivering the warrant to the defendant in this way satisfied the requirements of Rule 41(c). Id. at *2. We find no meaningful distinction between the method of service employed in Roach and the method employed in the matter before us. In each instance, the defendant was incarcerated, and the warrant was served upon him indirectly via prison officials, although there was no indication that circumstances precluded personal service.

Mr. Henretta also contends that the copy of the search warrant served upon him was defective because it did not include as an attachment the letter from Mr. Goodhart that was referred to in the affidavit supporting the application for issuance of the warrant. Mr. Henretta presents no authority supporting this argument. Based upon our decision in State v. Henning, 975 S.W.2d 290 (Tenn. 1998), we find the argument to be without merit. In Henning, the defendant argued for the suppression of evidence seized during the search of his home upon the ground that the affidavit underlying the search warrant was neither attached to nor filed with the warrant. We ruled that the failure to attach the affidavit to the search warrant was "inconsequential" and noted that "there is no statute or rule in Tennessee which requires an affidavit upon which a search warrant is issued to be attached or otherwise kept with the warrant." Id. at 296 (citing State v. Smith, 836 S.W.2d 137, 141 (Tenn. Crim. App. 1992)). As the Court of Criminal Appeals correctly reasoned in the instant matter, "[g]iven that the failure to attach or file an underlying affidavit does not affect the validity of the warrant, we cannot say that the failure to attach a letter included in support of the affidavit would render the warrant in this case invalid." Henretta, 2009 WL 1025828, at *14.

-32-

**Kidnapping as a Separate Offense**

Next, Mr. Henretta argues that the proof presented was insufficient to warrant his separate conviction for kidnapping, asserting that any movement or confinement of Ms. Crabtree was merely incidental to the accompanying felonies of robbery and murder.

In support of this argument, Mr. Henretta cites State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), wherein we heard consolidated appeals of two cases. The defendant in each case was convicted of both armed robbery and aggravated kidnapping. In one of the cases, the defendant and his accomplice robbed a restaurant at gunpoint, and, during the approximately five minutes that they were at the restaurant, the defendant forced one restaurant employee to remain in an office while his accomplice held three other employees outside at the back of the restaurant. The defendant in the other case robbed an insurance agency at gunpoint. In the second case, the robbery took approximately four minutes during which time the defendant forced the owner and an employee into a bathroom. At the time these offenses were committed, the applicable version of the aggravated kidnapping statute was the same as in the present matter, requiring conviction of "[a]ny person who unlawfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away another with the felonious intent to: (1) [c]ause the other to be confined secretly against his will; (2) [d]etain the other against his will; or (3) [s]end the other out of the state against his will." Tenn. Code Ann. § 39-2-301(a) (1982).[8] We acknowledged that a literal construction of this language could overrun other crimes such as robbery and rape, both of which frequently involve brief confinement. Seeking to preserve rights guaranteed a defendant under Article I, section 8 of this state's constitution,[9] we determined that the kidnapping convictions were improper in both cases under review, holding that the proper test was "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Anthony, 817 S.W.2d at 306. Later, however, in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), we replaced this so-called "essentially incidental" test with a two-part test. Under this two-part test, the evidence will be sufficient to support a separate conviction for aggravated kidnapping if 1)

---

[8] Although not quoted in the opinion, the statute set forth additional requirements for aggravating kidnapping.

[9] Article I, section 8 of the Tennessee Constitution provides "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

the movement or confinement of the victim exceeded that necessary for commission of the accompanying crime and 2) "the additional movement or confinement: [a)] prevented the victim from summoning help; [b)] lessened the defendant's risk of detection; or [c)] created a significant danger or increased the victim's risk of harm." Id. at 535. This two-part test provides the structure for applying the due process principles announced in Anthony. State v. Richardson, 251 S.W.3d 438, 443 (Tenn. 2008); State v. Fuller, 172 S.W.3d 533, 537 (Tenn. 2005). The kidnapping statute applicable in the instant matter was superceded under 1989 statutory revisions.[10] However, as we noted in Dixon, "the due process principles of Anthony and the test designed to implement them are equally applicable to kidnapping convictions under the law in effect both before and after the effective date of the 1989 Criminal Code Revision." 957 S.W.2d at 533 n.1.

Both parts of the Dixon test are met under the circumstances of the instant case. Ms. Crabtree was raped and robbed in the middle portion of the store and was then moved to the storeroom located in the rear portion of the store. In his confession, Mr. Henretta states that "we both grabbed her at the store room entrance. We told her to lay down and Goodhart had sex with her first and I went and got her purse . . . . After I got her purse I went back and had sex with her." Investigating officers found one of Ms. Crabtree's shoes on the floor in this middle portion of the store, where she was raped and robbed. Her other shoe and her body were found at the rear portion of the store. It is clear from Mr. Henretta's confession that the rape and robbery had already occurred when Ms. Crabtree was moved to the rear of the store and, therefore, moving her to that location obviously was not necessary to accomplish those offenses. Second, movement of Ms. Crabtree to the room at the rear of the store placed her farther from the front door and thereby diminished her access to any potential rescuer and lessened her assailants' risk of detection.

Mr. Henretta also asserts that Ms. Crabtree's body was moved to the rear of the store after she was killed, apparently contending that a conviction of kidnapping does not lie for transporting a dead body. Mr. Henretta references no evidence to support his assertion that Ms. Crabtree was already dead when she was taken to the rear of the store and the evidence presented indicates otherwise. Ms. Crabtree died from loss of blood as a result of the cuts to her neck. No evidence of blood was found in the middle portion of the store at the storeroom entrance where Ms. Crabtree was initially accosted, raped and robbed. However,

---

[10] Pursuant to the 1989 revision and subsequent amendment, the pertinent statute now defines kidnapping as "false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a) (Supp. 2009). Tennessee Code Annotated § 39-13-302(a) (2006) further provides that "[a] person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."

-34-

a large pool of blood was found near Ms. Crabtree's body in the rear portion of the store, showing that that is where Mr. Henretta cut her throat and where she bled to death.

## Constitutionality of the Death Penalty

Next, Mr. Henretta argues that the death penalty constitutes "cruel and unusual punishment" and, as such, it is specifically prohibited under the Eighth Amendment to the United States Constitution and under article I, section 16 of the Tennessee Constitution.[11]

The United States Supreme Court has pronounced that capital punishment is constitutional and does not violate the Eighth Amendment. Baze v. Rees, 553 U.S. 35, 47 (2008); Gregg v. Georgia, 428 U.S. 153, 177 (1976). Likewise, the Supreme Court of this state has concluded that capital punishment does not violate article I, section 16 of the Tennessee Constitution. Re-examining the issue in State v. Black, 815 S.W.2d 166, 188 (Tenn. 1991), we noted that article I, section 15 of the Tennessee Constitution states in pertinent part "[t]hat all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident, or the presumption great." We observed that the emphasized language has been included in each of this state's three constitutions, evidencing the framers' acceptance of capital punishment. Id. at 188. We further stated as follows:

> the common law rule mandated death for all convicted murderers; and, except for one brief period from 1915 to 1917, the death penalty has been the statutorily sanctioned punishment for the offense of first degree murder in Tennessee. . . . [S]ince the founding of this state both constitutions and legislative enactments have contemplated the imposition of the death penalty; and nothing in the constitutional or legislative history of this State mandates that death is invalid *per se* as cruel and unusual punishment under Article I, § 16.

Id. (footnote omitted); see also State v. Bane, 853 S.W.2d 483, 489-90 (Tenn. 1993). Based upon this federal and state authority, we find Mr. Henretta's constitutional challenge to the death penalty to be without merit.

---

[11] Both the Eighth Amendment of the United States Constitution and article I, section 16 of the Tennessee Constitution provide that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

## Mandatory Review

In all cases where the defendant has been sentenced to death, the statutory law of this state requires us to determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;

> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (2006).

Mr. Henretta asserts that none of these statutory criteria were properly satisfied; however, he fails to articulate a specific argument supporting this assertion. Rather, he relies solely on what he alleges to be a "report in the Tennessean," which he attributes to "John Seigenthaler." However, a newspaper article is not admissible evidence under the hearsay rule. See State v. Martin, No. 02C01-9512-CC-00389, 1997 WL 471158, at *6 (Tenn. Crim. App. Aug. 18, 1997) ("[T]he content of newspaper articles is hearsay that does not fall within an exception to the hearsay rule."). While Rule 201 of the Tennessee Rules of Evidence[12] allows a court to take judicial notice of certain adjudicative facts, it does not allow a court to take judicial notice of hearsay statements contained in a newspaper article.

---

[12] Pursuant to Tennessee Rule of Evidence 201, a court may take judicial notice of an adjudicative fact that is "not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b).

Next, we must consider whether the evidence supports the jury's finding beyond a reasonable doubt of aggravating circumstances and that these aggravating circumstances outweigh any mitigating circumstances. Pursuant to Tennessee Code Annotated section 39-2-203(g) (1982), the jury was prohibited from imposing the death penalty except upon a unanimous finding that the State had proven at least one of several statutory aggravating circumstances.[13] In this case, the jury concluded that the State successfully proved four statutory aggravating circumstances: (1) that "[t]he defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person," id. § 39-13-204(i)(2); (2) that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," id. § 39-2-203(i)(5); (3) that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," id. § 39-2-203(i)(6); and (4) that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any . . . rape, robbery . . . [or] kidnapping. . . .," id. § 39-2-203(i)(7). We must review the evidence in the light most favorable to the State and determine whether a rational trier of fact could have found beyond a reasonable doubt that the evidence established at least one of these aggravating circumstances and that such aggravating circumstance or circumstances outweigh any mitigating circumstances. State v. Kiser, 284 S.W.3d 227, 272-73 (Tenn. 2009). Upon our careful and thorough review of the record, we find sufficient evidence to support the jury's finding as to each of these four aggravating circumstances.

First, the State established beyond a reasonable doubt the aggravating circumstance that "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person," under section 39-2-203(i)(2). This factor was established upon presentation of undisputed proof that Mr. Henretta was previously convicted of rape in 1974, of kidnapping in 1989, and of rape and second degree murder in 1991.

Next, the State established beyond a reasonable doubt the aggravating factor that "the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," under section 39-2-203(i)(5). As we have recognized on prior occasions, this factor is "directed at 'the conscienceless or pitiless crime which is unnecessarily torturous to the

---

[13] "If the jury unanimously determines that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the state beyond a reasonable doubt, and said circumstance or circumstances are not outweighed by any mitigating circumstances, the sentence shall be death." Tenn. Code Ann. § 39-2-203(g).

victim.'" State v. Dicks, 615 S.W.2d 126, 132 (Tenn. 1981) (citing Proffitt v. Florida, 428 U.S. 242, 255 (1976)). This factor was established upon presentation of undisputed proof that, despite the fact that Ms. Crabtree was helpless, offered no resistance, and, after being raped twice, attempted to aid Mr. Henretta and Mr. Goodhart by warning them of their close proximity of the police station, she was stabbed three times and killed. Dr. Fenton Scruggs, the pathologist who examined Ms. Crabtree's body after the murder, testified that one of the wounds inflicted was so severe that it severed her jugular vein and carotid artery and exposed her spinal cord. Dr. Scruggs stated that, of the approximately twenty-five stab wounds to the neck that he had examined during the course of his career, he had "never seen one go back and actually cut the ligaments of the vertebral column and expose the spinal cord." He described it as "a wound of great force." In addition to the savagery with which Mr. Henretta stabbed Ms. Crabtree despite her failure to offer any resistence, Ms. Crabtree was ambushed while alone in the darkened store, and after being raped by two different men, was manhandled from one part of the store to another where she was murdered. It can be reasonably inferred from all of these factual circumstances that the murder in this case was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

The State established beyond a reasonable doubt the aggravating circumstance that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," under section 39-2-203(i)(6). This aggravating factor was established upon presentation of undisputed proof, as stated by Mr. Henretta in his confession, that Mr. Henretta murdered Ms. Crabtree while he and Mr. Goodhart were on the run from Pennsylvania law enforcement officers and that she was murdered upon agreement of Mr. Goodhart after she informed the two that there was a police station "right out the back door" of the building in which she was accosted. This evidence gives rise to the inference that Ms. Crabtree was killed to ensure that Mr. Henretta and Mr. Goodhart would evade detection by law enforcement officers.

Finally, the State established beyond a reasonable doubt the aggravating circumstance that "[t]he murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any . . . rape, robbery, . . . [or] kidnapping. . . .," under section 39-2-203(i)(7). This circumstance was established upon undisputed proof, as admitted by Mr. Henretta in his confession, that Mr. Goodhart and Mr. Henretta raped and robbed Ms. Crabtree shortly before killing her. In further regard to this aggravating circumstance, although Mr. Henretta argues that the evidence does not establish the offense of kidnapping, we do not agree and find that the evidence also established beyond a reasonable doubt that Ms. Crabtree was murdered after she was kidnaped by Mr. Henretta and Mr. Goodhart.

In mitigation of the four aggravating circumstances, Mr. Henretta presented evidence that he was abused and neglected during his childhood, that he has brain damage that impairs his ability to control aggressive urges, and that he has a below normal IQ of around 78 or 79. The evidence supports the jury's finding that the aggravating circumstances outweighed these mitigating circumstances beyond a reasonable doubt.

It is also our duty to determine whether the death sentence in this case is disproportionate to the penalty imposed in similar cases. Tenn. Code Ann. § 39-13-206(c)(1)(D). We have recognized the following as guiding principles pertinent to conducting a comparative proportionality review:

> In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed "is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence "less than death was never imposed in a case with similar characteristics." Our duty "is to assure that no aberrant death sentence is affirmed."

State v. Faulkner, 154 S.W.3d 48, 62 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998)) (internal citations omitted).

In comparing the case under review with previous cases, we find it appropriate to consider the following circumstances of the offense:

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or

presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

State v. Reid, 213 S.W.3d 792, 820 (Tenn. 2006) (quoting State v. Davis, 141 S.W.3d 600, 620 (Tenn. 2004)). As to the defendant, we ordinarily consider his or her "(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation." Id. (quoting Davis, 141 S.W.3d at 620).

In this case, Mr. Henretta and his accomplice hid in the thrift store where Ms. Crabtree was working alone as a clerk and, after raping and robbing her, Mr. Henretta cut her throat and killed her without provocation or justification. Ms. Crabtree offered no resistance to the offenses committed against her and was obviously helpless in the face of her assailants. Mr. Henretta, a Caucasian male, was forty-five years of age at the time of the murder and has a prior criminal history of violent crimes, include convictions for rape and murder. Mr. Henretta has experienced an unstable childhood, is of relatively low intelligence, and exhibits a degree of brain damage and dysfunction as a result of which he has an abnormally low ability to inhibit aggressive or violent urges. After being approached by law enforcement officers who advised him that they were investigating the murder of Ms. Crabtree, Mr. Henretta was cooperative and confessed to the crime; however, he did not offer any information regarding his involvement in the murder during the more than five years between the time of the murder and the time of this meeting. Mr. Henretta has admitted that what he did was wrong and has apologized to the family of the victim. We conclude that the sentence of death imposed in this case is neither excessive nor disproportionate when compared to the penalty imposed in similar cases.

In State v. Dicks, 615 S.W.2d 126, 132 (Tenn. 1981), the sentence of death was affirmed by this Court where the defendant murdered the owner of a second-hand clothing store by slitting the victim's throat in the course of a robbery at the store. The proof established that the victim offered no resistance at the time he was killed, having been rendered unconscious by the defendant and his accomplice, and the proof further established aggravating circumstances in that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39-13-2404(i)(5), and that the murder was committed during the commission of a robbery, id. § 39-13-2404(i)(7).

In State v. Campbell, 664 S.W.2d 281, 283-84 (Tenn. 1984), we affirmed imposition of the death sentence where the defendant murdered a seventy-two year old man during a robbery and the evidence established aggravating circumstances in that the defendant had been previously convicted of one or more felonies other than the present charge involving the use or threat of violence to the person, Tenn. Code Ann. § 39-2-203(i)(2), that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, id. § 39-2-203(i)(5), and that the murder was committed during the commission of a robbery, id. § 39-2-203(i)(7).

In State v. King, 694 S.W.2d 941, 947 (Tenn. 1985), we affirmed a sentence of death where the defendant murdered the victim during the robbery of a tavern and the evidence established aggravating circumstances in that the defendant had been previously convicted of one or more felonies other than the present charge involving the use or threat of violence to the person, Tenn. Code Ann. § 39-2-203(i)(2), and that the murder was committed during the commission of a robbery, id. § 39-2-203(i)(7).

In State v. Duncan, 698 S.W.2d 63, 65 (Tenn. 1985), we affirmed the jury's sentence of death where the defendant raped and murdered the night-shift cashier of a convenience store. The victim's "death resulted from three cuts to her neck of such force that they cut through her neck muscles, jugular vein, trachea, larynx and esophagus, and nicked the carotid artery." Id. at 66. The jury found aggravating factors in that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5), and the murder was committed during the commission of a rape and robbery, id. § 39-2-203(i)(7).

In State v. Harris, 839 S.W.2d 54, 59-60 (Tenn. 1992), imposition of the death sentence was affirmed where the defendant murdered a desk clerk and a security guard at the motel where they worked. Each victim had been stabbed by the defendant, and subsequent autopsies showed that the clerk died as a result of "a deep thrust wound across her neck that had cut the trachea and the neck's major blood vessels and had chipped the spinal column." Id. at 60. The proof established aggravating circumstances in that the defendant had been previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use or threat of violence to the person, Tenn. Code Ann. § 39-2-203(i)(2), the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind, id. § 39-2-203(i)(5), and the murder was committed during the commission of a robbery, Tenn. Code Ann. § 39-2-203(i)(7).

In Bush, 942 S.W.2d at 493, we affirmed the sentence of death where the defendant murdered the victim by stabbing her numerous times, and the evidence established that the murder was committed for the purpose of preventing arrest, Tenn. Code Ann. § 39-2-203(i)(6), and was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5).

Finally, in State v. Reid, 164 S.W.3d 286 (Tenn. 2005), we affirmed the jury's imposition of the death sentence where the defendant robbed an ice cream shop, kidnaped two employees of the shop, and thereafter murdered them by stab wounds to their necks which cut vital arteries and injured their spines. Id. at 301. The proof established aggravating circumstances in that the defendant had been previously convicted of one or more felonies other than the present charge, whose statutory elements involve the use of violence to the person, Tenn. Code Ann. § 39-13-204(i)(2), the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, id. § 39-13-204(i)(5), and the murder was committed for the purpose of preventing arrest, id. § 39-13-204(i)(6).

In summary, considering the nature of the crime and the characteristics of the defendant, our review confirms that the sentence of death imposed by the jury in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, and we do not find that the mitigating circumstances presented by Mr. Henretta are sufficient to create a significant distinction between his case and those cases summarized above.

**Conclusion**

In summary, upon our consideration of the entire record in this case, we conclude that the issues raised in this appeal do not warrant relief and, accordingly, Mr. Henretta's convictions and sentences are affirmed. The sentence of death shall be carried out as provided by law on the 4th day of October, 2011, unless otherwise ordered by this Court or other proper authority. It appearing that defendant John Patrick Henretta is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE