IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 17, 2011

**STATE OF TENNESSEE v. JEFFERY ALLEN BOSTON**

**Appeal from the Criminal Court for Sumner County**
**No. 784-2005     Dee David Gay, Judge**

_____

**No. M2010-00919-CCA-R3-CD - Filed October 18, 2011**

_____

A Sumner County Criminal Court jury convicted the defendant, Jeffery Allen Boston, of second degree murder, *see* T.C.A. § 39-13-210 (2006); domestic assault, *see id.* §39-13-111; and assault, *see id*. § 39-11-101.  At sentencing, the trial court merged the assault conviction into the domestic assault conviction and imposed a sentence of 25 years' incarceration for the second degree murder conviction to be served consecutively to a sentence of 11 months and 29 days for the domestic assault conviction.  On appeal, the defendant argues that the trial court erred by denying his motion to suppress photographs of the murder victim taken before the victim's death and by refusing to instruct the jury regarding voluntary intoxication. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

John Chadwick Long, Hendersonville, Tennessee (on appeal); and Bart Highers, Mike Carter and David R. Howard, Gallatin, Tennessee (at trial), for the appellant, Jeffery Allen Boston.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Bryna Grant, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On November 10, 2005, the Sumner County grand jury charged the defendant with the first degree premeditated murder of James D. Harshaw, the domestic assault of Sally

Boston, and the aggravated assault of Sally Boston for offenses occurring on August 27, 2005.

At trial, Sally Boston testified that she met the defendant in January 1997, that they married in June 1998, and that they had twin boys together. When the couple divorced in 2004, Ms. Boston received the house, custody of the children, and child support. After the divorce, Ms. Boston had a relationship with James D. Harshaw, the murder victim. Sometime after that relationship ended, Ms. Boston and the defendant attempted to reconcile. The defendant moved back into her home in July or August 2005, but he maintained the apartment where he had been living. Ms. Boston testified that her friend Jessica McCord and Ms. McCord's infant son moved into her home around the same time.

Ms. Boston testified that she and the defendant tried to reconcile "in full fashion." On one occasion, however, she spoke Mr. Harshaw's name while being intimate with the defendant. After that, she told the defendant that they could not be intimate again. The defendant, however, wanted to continue living in the house to remain a part of the children's lives. Ms. Boston began seeing Mr. Harshaw again. She testified that approximately five days prior to August 27, 2005, she overheard the defendant tell Ms. McCord that "he could not live in a house with so much estrogen, that he would not live in a house that he couldn't control." The defendant, nevertheless, continued to live in the house.

Ms. Boston testified that on the morning of August 27, 2005, she visited Mr. Harshaw at his residence, and the two returned to her house that afternoon. She called the defendant to let him know that Mr. Harshaw would be coming to the house and told him that she would appreciate it if he went somewhere else. The defendant told her "that everything was fine" and reminded her that she had the key to his apartment. The defendant told Ms. Boston that he had a bumper for her car and would be coming to the house later that day.

Ms. Boston testified that she was hosting a party for the NASCAR Bristol race that evening. Besides herself and Mr. Harshaw, Ms. McCord and Ms. McCord's friend, B.J. Turner, were present. They played pool in the garage before the race, and everyone was drinking beer. The defendant came to the house and put the bumper on her car. He joined the company and began drinking. She estimated that the defendant drank 12 beers over the course of the evening. Ms. Boston testified that everyone except Mr. Turner smoked marijuana provided by the defendant and Mr. Harshaw.

Everyone went inside the home to watch the race. At one point, the defendant and Mr. Harshaw stepped outside. When they returned, Mr. Harshaw was wet, "like [with] beer or something." The men told Ms. Boston that "everything was cool, and they . . .

-2-

bumped fists." At another point in the evening, Mr. Harshaw went to use the bathroom adjacent to Ms. Boston's bedroom, and she followed him, intending to knock on the door to scare him. Ms. Boston said that the defendant came up to her and asked, "[A]re you going to hold the f***ing thing for him too[?]" She testified that after that incident, the defendant told her that she was right about their relationship not working out and described her as "just mean." The defendant retrieved his television from another room to take to his car and told Ms. Boston that his friend, Mark, would come with him to get the rest of his things the next day. Ms. Boston believed that the defendant then left her home.

Ms. Boston testified that approximately 20 minutes later, while she was in Ms. McCord's bedroom giving a pacifier to Ms. McCord's son, she heard the defendant say, "[How] do you like me now, b***h[?]" followed by a thud. She said that she turned to see blood on the wall behind Mr. Harshaw. Ms. Boston said that the defendant was wielding a two-by-four board, so she raised her arm defensively. The defendant stabbed her with the two-by-four, and they continued to fight "throughout the house." Ms. Boston recalled trying to hit the defendant, but she was unsure whether she ever made contact. She remembered his hitting her. They fought until he pushed her to the ground. The defendant then left. Ms. Boston crawled to Mr. Harshaw. She said that the next thing she remembered was a police officer's taking pictures of her injuries.

Ms. Boston testified that she suffered a cut on her arm, bruising on her face, and a busted lip from the defendant's assault. She went to the hospital in Hendersonville to be with Mr. Harshaw and learned that he had been transported via helicopter to Vanderbilt University Medical Center (VUMC). She went to VUMC and stayed until the following day. When she returned home, she found a saw, sawdust, and pieces of a two-by-four on the pool table in the garage, which had not been there the previous day. She called the police for further investigation.

Jessica McCord testified that she lived with Ms. Boston and the defendant in August 2005. The defendant had already moved in when she and her son began living there. Ms. McCord testified that on August 24, 2005, Ms. Boston called her from work to ask her to watch her children that evening because she was going to a friend's house. Ms. McCord testified that she learned later that the friend was Mr. Harshaw. That evening, the defendant asked her where Ms. Boston was, but Ms. McCord told him she was not sure. On August 26, 2005, the defendant told Ms. McCord that he was going to move out of the house due to the inability to resolve the issues between himself and Ms. Boston.

Ms. McCord testified that on August 27, Ms. Boston went to Mr. Harshaw's house and returned home at 2:00 p.m. with Mr. Harshaw. Ms. McCord's friend, Mr. Turner, came to the house at approximately 3:00 p.m., and the defendant arrived at Ms. Boston's

residence soon thereafter. The defendant put some things in his car and made a trip to his apartment. The defendant put a bumper on Ms. Boston's car and joined the company. Everyone except Mr. Turner shared one marijuana joint provided by the defendant. Ms. McCord said the defendant told her and Mr. Turner that they should take Ms. McCord's baby and leave the house for awhile "because some s**t was going to go down." She said that they started the NASCAR party with 24 beers and that the defendant drank 12 by himself. At some point during the evening, the defendant drove to the store and returned with 12 more beers, but Ms. McCord did not recall his drinking any more beer.

Ms. McCord testified that she went out to the garage once while the race was on and saw the defendant and Mr. Harshaw talking outside. When she approached them and asked them to stay calm, they assured her that everything was fine. When the defendant and Mr. Harshaw came back inside the house, she heard the defendant say, "you must have a really – a really soft head, because when I hit you with the beer bottle, it didn't even bust." Ms. McCord recalled that Mr. Harshaw asked her for pain medicine after that incident.

Ms. McCord testified that at another point in the evening, Mr. Harshaw went to Ms. Boston's bedroom to use the attached bathroom. She thought that Ms. Boston must have also gone to the bathroom without realizing that Mr. Harshaw was already in it. She said that it might have appeared that something was going on between Ms. Boston and Mr. Harshaw, so the defendant had words with Ms. Boston. Ms. McCord said that the defendant and Ms. Boston also had an argument in the garage during the evening.

Ms. McCord remembered the defendant's charging a battery to a saw at approximately 10:00 p.m. and moving his television to his car. Ms. McCord said that she was in the kitchen preparing to bake chicken nuggets when the defendant said that he was leaving, and she saw him leave through the garage door. She testified that several minutes later, the defendant returned through the garage door and entered the living room with a two-by-four piece of lumber behind his back. She said that the board had a handle cut into it. The defendant had an angry expression on his face and walked straight to Mr. Harshaw, who was seated on the love seat. The defendant said, "How do you like me now, b***h?" The defendant struck Mr. Harshaw in the face with the two-by-four twice "with everything he had in him," and the board broke on the second hit. Ms. McCord said that when Ms. Boston jumped up to defend Mr. Harshaw, she tried to stop Ms. Boston. Ms. McCord testified that the defendant cut Ms. Boston with a piece of the two-by-four and that they fought throughout the house. The fight ended when the defendant pushed Ms. Boston against Ms. McCord's child's crib and Ms. Boston fell. Ms. McCord testified that after Ms. Boston fell, the defendant came back to the living room and hit Mr. Harshaw five times in the face with his fist. Ms. McCord said that Ms. Boston tried to call 9-1-1. The defendant knocked the phone out of Ms. Boston's hand, so Ms. McCord called 9-1-1.

Ms. McCord testified that she, Mr. Turner, and Ms. Boston moved the love seat where Mr. Harshaw had been sitting out of the house so that the children did not have to see the blood. She discovered the saw and sawdust in the garage when they began cleaning up the house on the following afternoon. Ms. McCord said that she assumed that the defendant had used the saw to cut the handle into the two-by-four.

Bruce John "B.J." Turner testified that he was at Ms. Boston's home on August 27, 2005, to watch a NASCAR race. He testified that the defendant drank a lot of beer but that he could not recall exactly how many bottles. Mr. Turner said that prior to the incident between the defendant and Mr. Harshaw outside, which Mr. Turner did not witness, everyone present was having a good time. After the incident, the defendant and Mr. Harshaw joked about what happened outside, but minor tension arose in the group.

Mr. Turner recalled that Mr. Harshaw and Ms. Boston put the children to bed while the defendant was not inside the house. Mr. Turner testified that 30 minutes after the race, the defendant came inside asking where Ms. Boston was and that Mr. Turner directed him to the back bedroom. Mr. Turner acknowledged that he told the police about an incident where Ms. Boston was in the shower and Mr. Harshaw had taken off his shirt. The defendant went to the bedroom, and Mr. Turner heard the defendant yelling but could not understand the specific words. After that, Mr. Harshaw and Ms. Boston came into the living room and sat down on the love seat. The defendant then left the house.

Mr. Turner testified that when the defendant returned, he had a two-by-four in his hands. The defendant said something to Mr. Harshaw and then struck Mr. Harshaw in the face with the board. Mr. Turner said that the defendant swung the board "[j]ust like [he was] sitting at home plate trying to hit a home run." He testified that the defendant hit Mr. Harshaw twice with the board, and the board broke on the second swing. He said that blood splattered against the wall and onto the ceiling. Mr. Turner testified that Mr. Harshaw neither struck back nor moved. He testified that the defendant and Ms. Boston began fighting. He did not know who struck whom first, but they moved throughout the house. He recalled that the defendant returned to the living room and hit Mr. Harshaw with his fists three or four times. Mr. Turner said that Ms. McCord called 9-1-1, and he and Ms. McCord followed the defendant when he left the house to try to get the license plate number of his car.

Hendersonville Police Corporal Greg Freudenthal testified that he was dispatched to Ms. Boston's home on August 27, 2005. Corporal Freudenthal met Ms. McCord and Mr. Turner in the driveway of the house. Officer Seth Miller and emergency medical personnel then arrived. Corporal Freudenthal found Mr. Harshaw on the love seat, and he described Mr. Harshaw as "badly beaten and bruised about his face." He said that Mr.

Harshaw had a "bone protruding from the right eye socket above the right eye." Corporal Freudenthal identified Officer Miller's photographs of the scene and of Mr. Harshaw's injuries, and the trial court admitted them into evidence. He said that the paramedics immediately rendered aid to Mr. Harshaw.

Corporal Freudenthal testified that Ms. Boston was covered in Mr. Harshaw's blood. He had her wash the blood off and then documented her injuries, which included bruising around her eye and a laceration on her arm. Corporal Freudenthal testified that he treated the case as an aggravated assault and did not collect any evidence because he believed that Mr. Harshaw's injuries were not life-threatening. He, likewise, directed Ms. Boston to clean up the scene. He testified that he interviewed everyone present in the house and then began efforts to locate the defendant.

Corporal Freudenthal testified that the defendant called the police station on August 28 to speak with him and that they arranged for the defendant to turn himself in the following day. Corporal Freudenthal arrested the defendant on August 29. After Mr. Harshaw passed away on September 1, the authorities amended the charges pending against the defendant to include first degree murder.

Doctor Richard Miller, the medical director of the trauma unit at VUMC, testified that Mr. Harshaw was transported via LifeFlight to the VUMC emergency room on August 27, 2005. Mr. Harshaw had lost consciousness for a short period of time during the flight and became combative when aroused, requiring him to be sedated and intubated during transport. Doctor Miller testified that the trauma team's initial physical examination revealed significant injury to Mr. Harshaw's face and head, including extreme swelling and lacerations on his face. Mr. Harshaw suffered blood clots in his eyes and underneath his scalp. A computerized tomography ("CT") scan "revealed an extensive brain injury where [Mr. Harshaw] had blood within the brain tissue itself, within the cerebrospinal fluid, and then he had a huge blood clot on the left side of his brain." Doctor Miller testified that Mr. Harshaw "had multiple cracks in his skull," and "[m]ost of the bones in his upper face were crushed and broken."

Mr. Harshaw's injuries required a neurosurgeon to perform emergency surgery to remove the blood clot. After the surgery, Mr. Harshaw improved to the point that he was able to follow simple commands, and the doctors were able to remove the ventilator. Approximately 24 hours after the removal of the ventilator, however, "Mr. Harshaw started getting very agitated, combative," and his heart rate and blood pressure went up. Doctors returned Mr. Harshaw to the ventilator and performed another CT scan, which revealed increased brain swelling and new areas of shear injuries.

On September 1, 2005, as Mr. Harshaw's condition worsened, doctors performed a tracheostomy and bronchoscopy as part of life support procedures. Doctor Miller testified that the procedures went smoothly, but two hours after the procedures, a nurse noticed that Mr. Harshaw's pupils were not responding. Soon thereafter, Mr. Harshaw experienced cardiac arrest. Attempts to resuscitate Mr. Harshaw proved futile, and Doctor Miller pronounced Mr. Harshaw dead at 2:02 p.m. Doctor Miller testified that the probable cause of Mr. Harshaw's cardiac arrest was "massive brain swelling" and herniation, which he described as part of the brain being "sucked down the spinal cord." Doctor Miller testified that Mr. Harshaw "clearly died from a severe closed head injury."

Doctor Staci Turner, a forensic pathologist at the Davidson County Medical Examiner's Office, testified that her office performed Mr. Harshaw's autopsy on September 2, 2005. She said that Mr. Harshaw died from multiple blunt force head injuries, including "a bruise and a scrape on the head, multiple skull fractures, bleeding around the brain, and swelling of the brain." Doctor Turner explained that eight individual skull fractures joined to create a hinge fracture, which was "one continuous fracture that allows the front part of the bottom of the skull to separate from the middle and bottom part." She testified that hinge fractures are often fatal, and she opined that it was unusual for Mr. Harshaw to have survived for as long as he did. She said that his injuries were consistent with being hit in the head with a two-by-four piece of lumber.

Elizabeth Lee Caleca testified for the defendant that she lived in the apartment below the defendant's apartment and that she had seen him use a board to prop open his car trunk. Ms. Caleca testified that the board used in the assault, previously admitted into evidence as Exhibit 29, did not appear long enough to use to prop open the defendant's car trunk.

Mark Mettes, the defendant's co-worker and friend, testified that he recalled the defendant's receiving a call at work from Ms. Boston after which the defendant said that he was going to pick up his possessions at Ms. Boston's home. Mr. Mettes took possession of the defendant's car at some point after August 27, 2005, and discovered that the trunk did not stay open on its own. He estimated that Exhibit 29 was long enough to keep the trunk open.

Following the close of proof and deliberations, the jury convicted the defendant of the charged offense of domestic assault and the lesser-included offenses of second degree murder and assault. The trial court merged the two misdemeanor assault convictions at sentencing and imposed a sentence of 25 years' incarceration for the second degree murder conviction and 11 months and 29 days for the assault conviction, to be served consecutively.

The defendant claims that the trial court erred by denying his motion to suppress photographs of Mr. Harshaw's injuries taken at the scene before paramedics transported him to the hospital. He contends that the probative value of the photographs was minimal because testimonial evidence would have been sufficient to describe Mr. Harshaw's injuries and did not outweigh the unfair prejudicial effect on the jury. He further contends that the photographs were of a nature to inflame the emotions of the jury. *See* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . . ").

Prior to trial, the trial court held a suppression hearing on the defendant's motion. Hendersonville Police Officer Seth Miller testified that he took the photographs of Mr. Harshaw and would not be able to testify about the severity of Mr. Harshaw's injuries without the photographs. Regarding two photographs of Mr. Harshaw as he lay on the couch, the State argued that the photographs were relevant to show Mr. Harshaw's location and the defendant's premeditation. Three photographs depicted the injuries to Mr. Harshaw's head. The State argued that each picture showed different angles and the results of different blows from the defendant. A sixth photograph showed Mr. Harshaw's hand and blood drops on the floor. As for the photographs of Mr. Harshaw lying on the couch, the trial court ruled that the photographs were relevant to the issues of premeditation and the location of Mr. Harshaw and that the photographs were not prejudicial because they "show[] a man with his injuries [and] don't glorify or focus on those injuries." The trial court admitted two of the photographs of Mr. Harshaw's head but ruled that the image in the third photograph was not relevant because it was "covered in the other photograph." The trial court admitted the photograph of Mr. Harshaw's hand without additional comment. The trial court stated that it denied "any motion to keep those out based on prejudicial effect."

The admission of photographs generally lies within the sound discretion of the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). That being said, a photograph is not admissible unless relevant to an issue that the jury must decide. *See State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993); *see also* Tenn. R. Evid. 401, 402.

Even evidence that is relevant to prove some part of the prosecution's case, however, should not be admitted if it will inflame the jury and unfairly prejudice the defendant. *See Vann*, 976 S.W.2d at 102. To be admissible, any unfair prejudicial effect of the evidence cannot substantially outweigh the probative value of the evidence. *See Vann*, 976 S.W.2d at 102-03; *see also* Tenn. R. Evid. 403. Although it can be said that photographs

of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not per se inadmissible. *State v. Jordan*, 325 S.W.3d 1, 85 (Tenn. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 1815 (2011). Rather, the danger of unfair prejudice posed by the relevant evidence is the touchstone of admissibility. Unfairly prejudicial evidence has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *See Banks*, 564 S.W.2d at 951.

The photographs in this case depict Mr. Harshaw as he lay on a couch, his injuries, and drops of blood below his hand. The trial court ruled that the photographs were relevant and not unfairly prejudicial, and we discern no abuse of discretion. Having reviewed the photographs, we cannot say that anything about the photographs is "particularly gruesome or inflammatory." *See Jordan*, 325 S.W.3d at 85. Therefore, we conclude that the trial court did not abuse its discretion by admitting the photographs.

*Voluntary Intoxication Instruction*

The defendant argues that the trial court committed reversible error by refusing to instruct the jury with respect to voluntary intoxication. According to the defendant, "[w]hether [his] intoxication level actually affected his mental capacity is a question of fact that needs to be decided by a jury." The record in this case reflects that the defendant requested an instruction on voluntary intoxication, but the trial court denied the request, ruling that no evidence of intoxication had been presented because, although the witnesses testified that the defendant had been drinking beer and had smoked marijuana, none of the witnesses testified that the defendant was impaired. The court observed that none of the witnesses testified that the defendant had difficulty moving around or communicating and that each of the witnesses testified that he drove to and from the store at some point in the evening without anyone questioning his ability to drive.

In criminal cases, a trial court is obliged to instruct the jury fully on the general principles of law that apply to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). "[A] defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). To fulfill the defendant's constitutional right to a trial by jury, a "clear and distinct exposition of the law" is necessary. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)).

Questions concerning the propriety of jury instructions are mixed questions of law and fact, and thus our standard of review is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn.

2001). On appeal, when determining whether jury instructions are erroneous, this court should "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). In evaluating claims of error in jury instructions, courts must remember that "'[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" *Vann*, 976 S.W.2d at 101 (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Even if a trial court errs when instructing the jury, such instructional error may be harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998).

In Tennessee, intoxication is not a defense to prosecution for an offense but "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). Intoxication is defined as the "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." T.C.A. § 39-11-503(d)(1).

> [W]hen a defendant is charged with an offense that requires a culpable mental state, such as first degree murder, "a jury instruction about a defendant's alleged voluntary intoxication at the time he or she committed the offense under consideration is required only if the intoxication was such that it compromised the defendant's capacity for whatever culpable mental state the offense required."

*State v. Henretta*, 325 S.W.3d 112, 130 (Tenn. 2010), *cert. denied*, __ U.S. __,131 S. Ct. 1816 (2011) (quoting *State v. Hatcher*, 310 S.W.3d 788, 815 n.16 (Tenn. 2010)).

In this case, the witnesses agreed that the defendant drank approximately 12 bottles of beer over the course of five or six hours and that he shared a marijuana joint with three other people. None of the witnesses, however, testified that the defendant's mental or physical capacity was in any way disturbed by the alcohol. Thus, although the defendant's consumption of alcohol was raised by the evidence, we cannot say that there was any proof presented at trial that related the defendant's intoxication with any disturbance of his mental or physical capacity or that showed an effect on his capacity to form the culpable mental state. Therefore, the trial court did not err by denying the defendant's request for a jury instruction on voluntary intoxication.

*Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE