IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs September 13, 2017

**STATE OF TENNESSEE v. JOSHUA GLENN BLACK**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2015-CR-487   Ross H. Hicks, Judge**

_____

**No. M2016-02584-CCA-R3-CD**

_____

A Montgomery County jury convicted the Defendant, Joshua Glenn Black, of first degree premeditated murder, felony murder, and two counts of especially aggravated kidnapping. The trial court imposed an effective sentence of life imprisonment. On appeal, the Defendant contends that (1) the trial court erred in allowing a trial exhibit, the front door from the victim's apartment, to remain in the courtroom for a period of time during the trial and (2) the State engaged in prosecutorial misconduct during closing arguments. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Roger E. Nell, District Public Defender; and Charles S. Bloodworth, Assistant District Public Defender, Clarksville, Tennessee, for the appellant, Joshua Glenn Black.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; John W. Carney, District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The evidence presented at trial established that during the early morning hours of April 23, 2014, the Defendant killed Ms. Nancy Lowry, with whom he had been seeking

a relationship, by stabbing her multiple times with a knife. The Defendant was convicted of first degree premeditated murder, felony murder during the perpetration of or attempt to perpetrate kidnapping, especially aggravated kidnapping with serious bodily injury, and especially aggravated kidnapping with the use of a deadly weapon. Because the Defendant does not challenge the sufficiency of the evidence relating to his convictions, we briefly summarize the evidence presented at trial.

According to the evidence presented at trial, the victim viewed her relationship with the Defendant as simply a friendship, and she was dating other men. On several occasions, the victim informed her friend Mr. Eric Delgado that she was attempting to end her friendship with the Defendant. The Defendant, however, told his roommate on multiple occasions that he loved the victim, that he did not like her dating other men, and that "if he can't have her, no one can."

In March 2014, the victim gave Mr. Delgado recordings of a conversation between the victim and the Defendant in which they discussed an incident that occurred on Valentine's Day of 2014. According to the recordings, the Defendant told the victim that he had purchased a bouquet of flowers and a ring and had hoped to give them to her. However, he discovered that the victim was at another man's home. The Defendant told the victim that he drove to the man's home and waited in a field for four hours. He acknowledged that he had a rifle while waiting outside the man's home and discussed wanting to kill the man. The Defendant initially denied that he would have hurt the victim. He stated that when he saw the victim's car pull up to the man's house, "anger seized through" him and he thought of how he should kill the victim and the man. He said:

> Should I slit her throat…? Should I blow their god d**n cars up when they're in it or when they're standing next to it? Or should I just blow [th]em to hell with this rifle? Or should I just kick the d**n door in and go in with a handgun and take both of them out, one of [th]em out, one of [their] kneecap[s] out, one's face off? I didn't know what the hell I wanted to do. I didn't know if I wanted to stick someone's head in a thing of f*****g boiling water and pull their god d**n face right off.

On April 23, 2014, at approximately 2:23 a.m., Ms. Vanessa Gross, who was staying at an apartment on the same floor as the victim's apartment, heard someone run loudly up the stairwell, pass by her apartment, and proceed toward the front of the building in the area where the victim's apartment was located. Ms. Gross then heard someone knock softly on the door of a nearby apartment and a male voice whispering. Ms. Gross looked through the peephole of her apartment but was unable to see the

victim's apartment or the man who was whispering. Ms. Gross heard an apartment door open and then slam shut.

The victim's fourteen-year-old son awoke to a loud "bang" coming from the victim's bedroom. He looked into the victim's bedroom where he saw the victim with a towel wrapped around her and leaning up against the bed. The Defendant's left arm was around the victim's waist, and he was holding a knife in his right hand. The victim screamed for her son to wake up his brother and to call 9-1-1. The victim's son woke up his brother, and they ran to another apartment where the occupant called 9-1-1.

Ms. Gross also heard a loud crash followed by a woman in the hallway screaming, "[S]omebody please help me, he's killing me, I'm bleeding." Ms. Vicky McCullum and Mr. Demetrius McCullum lived in an apartment below the victim's apartment and also heard a woman screaming for help. Ms. McCollum estimated that the screams occurred at approximately 2:30 a.m. Mr. McCollum heard someone else run to the door of the upstairs apartment, open the door, force the woman inside, and slam the door. Mr. McCollum heard the woman screaming for help a bit longer, followed by silence. Mr. and Ms. McCollum ran upstairs, but by the time that they reached the victim's apartment, no one was in the hallway. Ms. McCollum observed blood on the exterior side of the door of the victim's apartment and determined that the woman was forced back into the apartment. Ms. McCollum, Mr. McCollum, and Ms. Gross each called 9-1-1.

The victim also called 9-1-1 and reported in a weak voice that she had been stabbed. She was able to provide the operator with a portion of her address. According to the recording of the 9-1-1 call, which was entered as an exhibit at trial, the operator stated that she was unable to understand the victim, and the Defendant could be heard in the background providing an address.

When police officers arrived at the victim's apartment, they observed blood on the exterior side of the door and the floor outside the apartment. Upon entering the apartment, the officers found the victim lying naked in the hallway and holding a cellular telephone. She was covered in blood and was barely breathing. The Defendant was either standing or kneeling over the victim and had blood all over him. The officers ordered the Defendant to step away from the victim. Upon searching the Defendant, the officers found a knife with a three-and-one-half-inch blade in the Defendant's pants pocket. The Defendant admitted stabbing the victim with the knife. The victim was transported by ambulance to the hospital, where she died.

The officers arrested the Defendant and placed him in the back of a patrol car while the officers attempted to determine the victim's identity and contact information for her family. While in the patrol car, the Defendant told Clarksville Police Officer Stephen

Hurt that he "got drunk and could not handle [himself]." The Defendant said that he wanted to marry the victim but that her parents did not like him. When asked whether the Defendant smelled of alcohol, Officer Hurt testified, "He smelled like blood. He smelled like he was messed up, dirty, sweaty, blood."

Dr. Adele Lewis, the forensic pathologist who performed the victim's autopsy, concluded that the cause of the victim's death was multiple blunt force and sharp force injuries. The victim sustained blunt force injuries to her head and multiple cuts and scrapes all over her body. She had four stab wounds in her abdomen, one stab wound below her right breast, and four stab wounds in her neck. One of the stab wounds to the victim's abdomen, which resulted in an injury to her liver, and the stab wound below her right breast, which punctured her right lung, were potentially fatal. One of the stab wounds to her neck was a fatal wound that resulted in injuries to the major veins in her neck and the bones in her spine.

Dr. Lewis was unable to determine the sequence in which the injuries were inflicted. She testified that the stab wounds to the victim's neck did not injure her voice box but that the wounds would have affected her ability to speak because she was losing so much blood that she was going into shock and dying. Dr. Lewis acknowledged that the stab wounds to the victim's neck could have been inflicted after the victim was screaming outside of her apartment. Dr. Lewis explained, "Some people instantly collapse when they sustain an injury like that. Some people are able to run a little bit. It certainly would have been bleeding very rapidly, and I wouldn't have expected [the victim] to maintain consciousness for more than a few minutes."

The jury convicted the Defendant of first degree premeditated murder, felony murder during the perpetration of or attempt to perpetrate kidnapping, especially aggravated kidnapping with serious bodily injury, and especially aggravated kidnapping with the use of a deadly weapon. The trial court merged the conviction for premeditated first degree murder into the conviction for felony murder and the conviction for especially aggravated kidnapping with serious bodily injury into the conviction for especially aggravated kidnapping with the use of a deadly weapon. The trial court imposed concurrent sentences of life imprisonment for felony murder and twenty-five years for especially aggravated kidnapping with the use of a deadly weapon.

## ANALYSIS

### A. Display of the Apartment Door

During the second day of the trial, the State presented the blood-stained exterior door to the victim's apartment through the testimony of Crime Scene Unit Officer Darren

Koski, and the door was entered into evidence as an exhibit without objection from the Defendant. The Defendant contends that the door remained in the courtroom within the jury's view for the remainder of the day and that the trial court erred in failing to have the door removed from the courtroom following Officer Koski's testimony. The Defendant, however, failed to object at trial to the continued presence of the door in the courtroom and, therefore, has waived our review of this issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The Defendant does not allege on appeal that the failure to remove the door from the courtroom amounted to plain error. Accordingly, the Defendant is not entitled to relief with regard to this issue.

## B. Closing Arguments

The Defendant contends that during closing arguments, the prosecutor improperly argued that the Defendant pulled the victim back into her apartment prior to inflicting the fatal stab wounds. The Defendant maintains that these comments were not supported by the evidence presented at trial. The State responds that the Defendant has waived the issue on appeal by failing to lodge a contemporaneous objection at trial and has failed to establish plain error.

The Defendant failed to object during the State's closing argument at trial but raised the issue in his motion for new trial. Our Supreme Court previously stated that the "[f]ailure to object to a prosecutor's statements during closing arguments results in waiver on appeal." *State v. Henretta*, 325 S.W.3d 112, 125 (Tenn. 2010) (citations omitted). However, in *State v. Hawkins*, the Tennessee Supreme Court applied plenary review, rather than plain error review, to two allegations of improper prosecutorial closing argument when the defendant failed to object at trial but raised the issues in his motion for new trial. 519 S.W.3d 1, 48-49 (Tenn. 2017). The Court applied plain error review to two other allegations of improper prosecutorial argument when the defendant failed to both object at trial and raise the issues in his motion for new trial. *Id.* at 49-50. Regardless of the review to be employed, we conclude that the prosecutor's statements were proper.

"Closing arguments serve to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *Id.* at 47 (citations and quotations omitted). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008)). Prosecutors, however, "must not lose sight of their duty to seek justice

impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id.* at 47-48 (quoting *Banks*, 271 S.W.3d at 131). Accordingly, a "prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (citations omitted).

The Defendant challenges as "speculation" the prosecutor's statement during closing argument that "I know what is going to be said—I can't prove when these blows were given. I cannot but I am telling you this logical inference from what happened." The prosecutor continued:

> He pulled her back in that apartment for something. It wasn't to render aid. The officer said he got there, he wasn't giving aid. He was standing near her. She had the phone, making her own 911 call. And there is no aid given. So it wasn't for that. So let me ask you, what is the only purpose to drag her back in there? Like it has already been discussed, he wasn't running. He didn't run. So it wasn't so this whole thing wouldn't be discovered. Bring her back in here and just hid her. It wasn't for that. There is only one reason to drag her back in, only one, and that is to finish what he had started. That's the only reason.

The Defendant also maintains that the prosecutor's comment during rebuttal that "[w]hen he [dragged] her to that bathroom, he inflicted the fatal wound and killed her, that's especially aggravated kidnapping, and that is also felony murder" was not supported by the evidence presented at trial.

The prosecutor's comments, when viewed in their context, were made in support of his argument that the Defendant forced the victim back inside her apartment where he continued to stab her. Although the Defendant describes the prosecutor's comments as "speculation," we conclude that the prosecutor was drawing a proper inference based on the evidence. Multiple witnesses heard the victim screaming for help while outside of her apartment. Mr. McCollum then heard someone run to the apartment door, open it, force the victim inside, and then slam the door. Mr. McCollum heard the victim continue to scream for a period while inside of the apartment. Blood was on the exterior door and the ground outside of the apartment. Dr. Lewis testified that the victim could have received the stab wounds to the neck after she was screaming outside of her apartment. The victim was vigorously screaming while she was outside her apartment but was barely audible by the time she completed the call to 9-1-1. Accordingly, we hold that the

prosecutor's statements did not mislead the jury about rational inferences that could be drawn from the evidence and that the Defendant is not entitled to relief.

## CONCLUSION

Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE